COURT VIEW CENTRE, L.L.C.,
Appellant–Plaintiff,

v.

Robert WITT and The Bekan
Insurance Group, Inc.,
Appellees–Defendants.

No. 45A03–0008–CV–303.

Court of Appeals of Indiana.

Aug. 7, 2001.

Edward P. Grimmer, Crown Point, IN, Attorney for Appellant.

Philip E. Kalamaros, Hunt, Suedhoff & Kalamaros, South Bend, IN, Attorney for Appellees.

## OPINION

BROOK, Judge

### Case Summary

Appellant-plaintiff Court View Centre, L.L.C. ("Court View") appeals the trial court's judgment in favor of appellees-defendants Robert Witt ("Witt") and The Bekan Insurance Group, Inc. ("Bekan") (collectively, "the Appellees"). We affirm.

### Issues

Court View raises four issues for our review, which we consolidate and restate as follows:

I. whether the trial court erred in entering judgment on the evidence in favor of the Appellees pursuant to Indiana Trial Rule 50(A) where the testimony of Thomas Krafft ("Krafft") supported Court View's claim for damages;

II. whether the trial court erred in excluding the testimony of Court View's expert witness James Kalka ("Kalka") and not granting a new trial; and

III. whether the trial court erred by entering judgment on the evidence on the issue of replacement cost coverage.

### Facts and Procedural History

In November 1995, Krafft, acting on behalf of Court View, purchased a building and property in Porter County, located across the square from the Porter County Courthouse. The building and property

were purchased from Terry Groot ("Groot") for $500,000. Court View purchased insurance issued by American States through Bekan and its agent, Witt. Krafft sought $1.5 million in coverage because "you couldn't have begun to replace [the building] for what we paid for it." Record 257. Krafft and Witt did not discuss whether the policy would be for replacement cost coverage or actual cash value. On February 14, 1996, fire destroyed the building owned by Court View.

The first policy was an actual cash value policy with a limit of $1.5 million. Krafft received the policy and approved its terms and limits. However, Krafft desired a lower premium and asked Witt to change the policy. The second policy, which replaced the first, was also an actual cash value policy with a limit of $1.5 million but a lower premium. Again, Krafft received the policy and approved its terms and limits. At some point, Krafft allegedly inquired about further reducing the premium. It is unclear whether he actually directed Witt to change the policy. However, Witt issued a third policy, again replacing the previous policy, that was an actual cash value policy with a limit of $750,000. Court View received the policy, but Krafft allegedly was not aware of the policy until after the fire. Pursuant to this policy, American States paid Court View $751,000[1] for its loss.

On April 22, 1996, Court View filed a complaint against American States, Bekan, and Witt. Court View dismissed its claim against American States upon payment under the third policy. Court View sought damages in the amount of $750,000 from Bekan and Witt under a theory of negligence. Specifically, Court View alleged that Bekan and Witt breached the duty of care owed to Court View by reducing Court View's coverage by fifty percent "without the knowledge, direction or consent of Plaintiff." The policy in effect at the time of the fire provided that the value of the covered property would be determined "[a]t the actual cash value as of the time of loss or damage" with a limit of $750,000. Court View contended that the actual cash value of the building was greater than $1.5 million, the limit in each of the first two policies, and that the Appellees were liable for the damages in excess of the amount paid by American States under the third policy, $750,000, because the Appellees reduced Court View's coverage without its consent.

On November 15 and 16, 1999, a jury trial was held on Court View's claims against the Appellees. At the trial, Krafft, a certified public accountant and financial planner, testified as the owner[2] of the building that in his opinion the property was worth $1.5 million. Krafft indicated that he based his opinion on a cost of $25 to $30 a square foot to rebuild the building, an income analysis, and a tax credit. Groot also testified as the previous owner of the building. Groot testified that he felt the building and land were worth $900,000. Groot also acknowledged that in his deposition he opined the land and building were worth approximately $620,000. Groot sold the property for $500,000.

Court View also presented the testimony of its expert, Kalka, a licensed public adjuster. Kalka's testimony was excluded by the trial court because his opinion was based on unreliable data. The court stated, "nothing that's been presented to me has changed my belief that the witness has inadequate, not by his fault, inadequate

---

1. The policy provided coverage of $1,000 for damage to signage on the property in addition to the $750,000 limit.

2. Court View owned the property; Krafft was the Manager of the partnership. Record 15.

information upon which to make a reliable estimate of the value of the building, guesswork using his own words. And so, I won't allow his testimony to go to the Jury." Record 569. Court View also presented an appraisal of the building and property prepared by Daniel Skimehorn ("Skimehorn") of Lee & Associates on November 3, 1995. Skimehorn concluded that the property had an actual cash value of $650,000 including the value of the land. In determining the value of the property, Skimehorn relied on three appraisal methods: the income capitalization approach, the cost approach, and the sales comparison approach. Skimehorn indicated in his appraisal that the replacement cost of the building was approximately $2.5 million. With depreciation, Skimehorn valued the building at $481,939. Record 621.

At the close of Court View's case, the Appellees moved for a directed verdict, which was converted to a motion for judgment on the evidence pursuant to Indiana Trial Rule 50. The trial court granted the motion and entered judgment against Court View as follows:

All right. The Defendants moved for a directed verdict. That, of course, is now labeled a Motion for Judgment on the Evidence, under Trial Rule 50.

And as to the separate points raised, the Defendants have argued there's no breach—no duty, first, and no breach of the standard of care, and the Court's finding is against the Defendant on those points.

As to the other element, that there is no proof of damages, I find the Defendant is correct, and I'm going to direct—I will enter verdict in favor—enter judgment in favor of the Defendant and against the Plaintiff. There is simply not evidence in the record to support the Plaintiff's claim that the Plaintiff sustained damages in excess of that which

was insured against under the American States policy, and the Plaintiff has already been paid. As I understand it, it's uncontested. The Plaintiff was paid $750,000 on the American—under the American States policy, and there is no evidence to support the Plaintiff's claim that he sustained—that the Plaintiff sustained damages in excess of that under the circumstances here. And if there were no damages, under the policies or any of these, then the Defendants aren't liable.

The policies were sent to the Plaintiff, Plaintiff's representative, Mr. Krafft. The policies had damages clauses, and I thank counsel for pointing those out to me where they were. I was shuffling through those policies. They've been talked a lot about in the last couple days, but not specifically read. The damage clauses of the policies place a limitation on the damages, which the Plaintiff apparently accepted, and the damages paid were in excess of that limitation, at least, based upon what we've heard in Court.

And so, the Court finds that the Defendants' Motion for Judgment on the Evidence should be granted, and I'll withdraw the case from the Jury.

Record at 694–95.

On December 15, 1999, Court View filed motions (1) for relief and new trial pursuant to Indiana Trial Rule 50, (2) for relief from judgment pursuant to Trial Rule 60(B)(1), and (3) to correct errors pursuant to Trial Rule 59. The trial court held a hearing on the motions on June 26, 2000. On July 18, 2000, the trial court denied all motions.

### Discussion and Decision

Court View contends that the trial court erred in granting judgment on the evidence in favor of the Appellees because "[t]here was competent evidence to contro-

vert an [actual cash value] loss in excess of what American States paid." Specifically, Court View argues that Krafft's testimony valuing the building at $1.5 million was evidence supporting Court View's claim of damages based on an actual cash value of the building in excess of $750,000. Likewise, Court View argues that Groot's testimony supports its claim that the actual cash value of the building was greater than $750,000. The Appellees respond that neither Krafft's nor Groot's testimony is sufficient to support Court View's claim. Specifically, the Appellees argue that Krafft's opinion lacked a valid foundation and was therefore speculative and that Groot's opinion of value conflicted with his prior testimony.

Second, Court View asserts that the trial court erred in excluding the testimony of its expert, Kalka. In particular, Court View argues that Kalka had sufficient personal knowledge of the building and its conditions to formulate an opinion as to the value of the building. Alternatively, Court View argues that assuming Kalka's testimony was properly excluded, the trial court should have ordered a new trial under Trial Rule 50(C) because Kalka's statement that his opinion was based on guesswork was a surprise to Court View. The Appellees argue that Kalka's testimony was properly excluded because it was too unreliable to be helpful to the jury.

Third, Court View contends that the trial court erred in removing the issue of replacement cost coverage from the jury. Court View argues that Bekan and Witt were negligent for failing to seek replacement cost coverage rather than actual cash value coverage. Court View asserts that it requested replacement cost coverage and that the Appellees failed to seek or obtain such coverage and therefore breached the standard of care. Accordingly, Court View urges that whether the *actual cash value* of the property was greater than $750,000 was irrelevant on the issue of whether the Appellees had a duty to seek *replacement cost* coverage. The Appellees respond that the issue of whether they had a duty to seek or obtain replacement cost coverage was not an issue at trial and that they did not consent to litigation of that issue. Further, the Appellees argue that, assuming the issue was litigated, Court View failed to present any evidence to support a claim of negligence for failure to obtain replacement cost coverage.

### Standard of Review

The purpose of a motion for judgment on the evidence is to test the sufficiency of the evidence. *Zemco Mfg., Inc. v. Pecoraro,* 703 N.E.2d 1064, 1071 (Ind.Ct.App. 1998), *trans. denied* (1999). "Upon review of a trial court's ruling on a motion for judgment on the evidence, we apply the same standard as the trial court, considering only the evidence and reasonable inferences most favorable to the nonmoving party." *Levee v. Beeching,* 729 N.E.2d 215, 223 (Ind.Ct.App.2000). "Judgment may be entered only if there is no substantial evidence or reasonable inferences to be drawn therefrom to support an essential element of the claim." *Id.*

> Such determination is to be made by a two-step analysis of all the direct and circumstantial evidence then available. First, [the court] must determine whether
>
> (a) quantitatively, reasonable evidence supporting the burdened party's allegations is absent, that is, none at all exists. If so, the motion is to be granted. If such evidence is present, however, the court must then determine whether
>
> (b) qualitatively, a reasonable inference the burdened party's allegations are true logically may be drawn from such evidence.

Qualitative failure in this sense, occurs if the trial court reasonably can say, either

(1) the witness(es) presenting such evidence is (are) not credible, or

(2) the inference the burdened party's allegations are true may not be drawn without undue speculation.

*Dettman v. Sumner*, 474 N.E.2d 100, 104 (Ind.Ct.App.1985) (footnote omitted); *see also Hampton v. Moistner*, 654 N.E.2d 1191, 1193 (Ind.Ct.App.1995) ("A judgment on the evidence is proper only when there is a total absence of evidence in favor of the plaintiff, that is, that the evidence is without conflict and is susceptible of only one inference and that inference is in favor of the defendant. Or, the inference intended to be proven by the evidence cannot logically be drawn from the proffered evidence without undue speculation.") (citations omitted). "If evidence fails to create a reasonable inference of an ultimate fact, but merely leaves the possibility of its existence open for surmise, conjecture or speculation, then there is no evidence of probative value as to that ultimate fact and a Trial Rule 50 motion should be granted." *Pearson v. First Nat'l Bank of Martinsville*, 408 N.E.2d 166, 171 (Ind.Ct.App. 1980).

### I. Owners' Testimony

First, Court View claims that Krafft's testimony was sufficient to defeat the Appellees' motion for judgment on the evidence. Court View argues that Krafft was competent to testify as to the value of the building because he was both an owner of the property and a certified public accountant. Specifically, Court View contends that because Krafft's opinion of value was greater than $750,000, there was an issue for the jury to determine, namely, whether the actual cash value of the building was greater than the amount received by Court View, and that as such judgment on the evidence was improper.[3] The Appellees respond that Krafft's testimony did not provide probative evidence that the actual cash value was greater than $750,000. The Appellees argue that Krafft's opinion was based on others' opinions and that his opinion of value lacked a proper basis to allow the issue to go to the jury.

The policies at issue were actual cash value policies. Actual cash value is not the equivalent of replacement cost.

The actual cash value policy is a pure indemnity contract. Its purpose is to make the insured whole but never to benefit him because a fire occurred. Replacement cost coverage, on the other hand, reimburses the insured for the full cost of repairs, if he repairs or rebuilds the building, even if that results in putting the insured in a better position than he was before the loss.

*Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 352 (Ind.1982). "If an old building burns to the ground, the actual value is commonly established by reference to its fair market value less the value of the land on which the building sits." *Id.* at 353. In determining the actual cash value of property, Indiana follows the broad evidence rule. Under the broad evidence rule,

Where insured buildings have been destroyed, the trier of fact may, and should, call to its aid, in order to effectuate complete indemnity, every fact and circumstance which would logically tend to the formation of a correct estimate of the loss. It may consider original cost

---

**3.** The maximum amount that Court View could have received under the policy was $750,000. However, if the Appellees had a duty to provide insurance at $1,500,000 and did not, Court View could collect for the additional, if any, over $750,000.

and cost of reproduction; the opinion upon value given by qualified witnesses; the declarations against interest which may have been made by the insureds; the gainful uses to which the building might have been put as well as any other fact reasonably tending to throw light upon the subject.

*Id.* at 356 (quoting *McAnarney v. Newark Fire Ins. Co.*, 247 N.Y. 176, 159 N.E. 902, 905 (1928)). "[I]n applying the rule, a court may take into account market value, replacement cost, and depreciation. In addition, such factors as location and obsolescence may be considered." *Ohio Cas. Ins. Co. v. Ramsey*, 439 N.E.2d 1162, 1169 (Ind. Ct.App.1982). The rule "'requires the fact-finder to consider all evidence an expert would consider relevant to an evaluation, and particularly both fair market value and replacement cost less depreciation. If the appraiser finds it appropriate under the particular circumstances he may, after weighing both factors, settle on either alone.'" *Travelers Indem. Co.*, 442 N.E.2d at 357 (quoting *McAnarney*, 159 N.E. at 905).

■ Here, Krafft testified that in his opinion the building was worth $1.5 million. An owner may testify as to the value of property. *See City of Lake Station v. Rogers*, 500 N.E.2d 235, 243 (Ind.Ct.App. 1986); *see also Robinson v. Watts Detective Agency*, 685 F.2d 729, 739 (1st Cir. 1982) ("An owner of a business is competent to give his opinion as to the value of his property."), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983). However, there must be a basis for that valuation. Ind. Evidence Rule 701 ("If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue."); *see Rich v. Eastman Kodak Co.*, 583 F.2d 435, 437 (8th Cir. 1978) (concluding that the owner's failure to present a factual basis for valuation rendered the valuation meaningless); *Dietz v. Consol. Oil & Gas, Inc.*, 643 F.2d 1088, 1094 (5th Cir.1981) ("'[W]here the owner bases his estimation solely on speculative factors, the owner's testimony may be of such minimal probative force to warrant a judge's refusal even to submit the issue to the jury.'" (quoting *Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 699 (5th Cir.1975), *cert. denied*, 424 U.S. 943, 96 S.Ct. 1412, 47 L.Ed.2d 349 (1976))), *cert. denied*, 454 U.S. 968, 102 S.Ct. 513, 70 L.Ed.2d 385 (1981); *Klapmeier v. Telecheck Int'l, Inc.*, 482 F.2d 247, 253 (8th Cir.1973) (stating that although an owner of property may properly testify to its value, owner's testimony could not support the verdict because it was based in part on speculative factors).

■ Here, the testimony of Krafft is too speculative to support his claim that the actual cash value of the building was greater than $750,000. After repeated attempts to lay a foundation for his opinion on direct examination, Krafft testified as follows:

Q Will you focus on those factors, and explain to the Jury the factors, as they existed, as you knew them to exist, and as you relied upon, preceding the fire that leads to the opinion, your opinion of value of the property you own?

. . . .

A In order to help determine the value of the building, as a simple test, you'd use 25 to $30 per square foot to rebuild that building. That's a basic cost that we would have had to pay for the basic structure, not including anything special or the electric and plumbing that was already there.

Q So, you—one of your factors is using a rough dollar figure for square footage?

A Yes.

Q Per square foot?

A Yes.

Q Did you also use an income analysis?

A Yes.

Q Okay. Did you—did you also factor in the advantageous financing that might—that was available?

A Yes, you would.

Q Okay. Any other factors that you factor into or rely in formulating your opinion—

A I used.

Q (Continuing)—as to the value of the property?

A Well, the $400,000 historical tax credit we were going to get.

Q Okay. You don't get it un—if the building didn't get rehabbed, right?

A That's correct.

Q Okay. Anything—any other factors you relied upon in formulating your opinion of value?

A Not at that time.

Q Okay. Had you seen—before the fire loss, had you seen a copy of the appraisal that was done for the bank?

A No.

Q Okay. Since that time, have you seen that?

A Yes.

Q Okay. And did that appraisal have in it a replacement cost figure?

A I believe it did.

Q Okay. Had also in there a depreciation factor?

A Yes.

Q Do you include those factors into—in formulating your opinion?

A No.

Q What is your opinion of value, as the owner at the time of the loss?

. . . .

A At least a million and a half dollars.

First, Krafft indicated that he relied on a $25 to $30 per square foot cost. However, this was the cost to *rebuild* the building and was not the actual cash value of the building at the time of the loss. *See Travelers Indem. Co.*, 442 N.E.2d at 355 (rejecting replacement cost without deduction for depreciation as a proper method of determining actual cash value) (citing *Elberon Bathing Co. v. Ambassador Ins. Co.*, 77 N.J. 1, 389 A.2d 439, 442 (1978) (holding that using pure replacement cost as the method of determining actual cash value "would violate the principle of indemnity by providing a windfall to the insured")). Krafft also stated that he used an income analysis, but he offered no explanation of the analysis. In fact, the property was not generating income at the time of the fire as it had been sitting empty for approximately two years. Finally, Krafft testified that he considered the tax credit he would receive. However, the tax credit would have applied only if the building were renovated in accordance with historical landmark requirements. The possibility of receiving a tax credit is too speculative for valuation purposes. As such, the inference that the property was valued at $1.5 million cannot be made without undue speculation and conjecture.[4] " 'When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails to meet the requirements of Rule 701, first because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second because the opinion does not help the jury

---

**4.** It is interesting to note that Court View's own expert, Skimehorn, valued the property at $650,000, well below Krafft's opinion of $1.5 million.

but only tells it in conclusory fashion what it should find.'" *Ackles v. Hartford Underwriters Ins. Corp.*, 699 N.E.2d 740, 743 (Ind.Ct.App.1998) (quoting *United States v. Rea*, 958 F.2d 1206, 1216 (2nd Cir.1992)), *trans. denied* (1999). Here, Krafft's testimony is insufficient to support his claim against the Appellees as it merely states in conclusory fashion that the building was valued at $1.5 million.[5]

■ Likewise, Groot's testimony is insufficient to establish an actual cash value greater than $750,000. As a previous owner of the property, Groot was competent to testify as to its value. At trial, Groot testified that the property was worth $900,000 and that he insured it for $1,483,500. Groot gave no basis for his opinion that the building was worth $900,000 other than stating that it would cost approximately $50 a square foot to replace the structure. Additionally, the property was generating income at the time it was insured by Groot. Groot did not indicate whether the insurance coverage was based on actual cash value, replacement cost, or some other basis. Furthermore, Groot acknowledged that he had previously stated under oath that the property was worth $620,000 as that is what he, a nonpressured, willing seller, would have sold it for to an interested buyer. Groot offered conflicting evidence of value thereby rendering his testimony insufficient to defeat the Appellees' motion for judgment on the evidence. *See Burke v. Burke*, 135 Ind.App. 235, 243, 191 N.E.2d 530, 534

(1963) (noting that "a directed verdict for the defendant is proper when the plaintiff's only evidence on a material allegation essential to recovery is a statement of one of its witnesses that is in conflict with other statements of that same witness made in the trial of the cause"). Groot's opinion suffers from the same deficiencies as Krafft's: he failed to provide a valid basis for his opinion of the building's value. Court View failed to present substantial evidence of probative value on the element of damages. Therefore, the trial court did not err in granting the Appellees' motion for judgment on the evidence.

## II. Exclusion of Kalka's Testimony

Second, Court View contends that the trial court erred by excluding the opinion of its expert witness, Kalka. Court View argues that Kalka had sufficient personal knowledge of the conditions of the building to determine the actual cash value. The Appellees assert that Court View has waived any error in the exclusion of Kalka's testimony by failing to make an offer of proof.

"It is within the trial court's sound discretion to decide whether a person qualifies as an expert witness and we will reverse only upon a showing that the trial court abused its discretion." *Creasy v. Rusk*, 730 N.E.2d 659, 669 (Ind.2000).

During direct examination, when the trial court excludes evidence, the proponent of the evidence must make an offer of proof[6] to preserve the ruling for

---

5. Krafft's opinion that the property was valued at $1.5 million appears to be based strictly on replacement cost. Krafft indicated that he sought to insure the building for $1.5 million because "you couldn't have begun to replace [the building] for what we paid for it."

6. · Indiana Evidence Rule 103 provides in pertinent part,

(a) **Effect of Erroneous Ruling.** Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
. . .
(2) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by a proper offer of proof, or was apparent

appellate review.... [T]he offer of proof must demonstrate the substance, purpose, relevancy, and materiality of the excluded evidence in order to enable the appellate court to determine on appeal whether the exclusion was proper. The proponent has not adequately preserved the exclusion of a witness's testimony as an issue for appellate review if he does not make an offer of proof. *Paullus v. Yarnelle,* 633 N.E.2d 304, 307 (Ind.Ct.App.1994) (internal quotations and citations omitted), *trans. denied.* "The purpose of an offer to prove is to enable both the trial court and the appellate court to determine the admissibility and relevance of the proffered testimony. The failure to make an offer to prove results in a waiver of the asserted evidentiary error." *Gouge v. Indiana Commuter Transp. Dist.,* 670 N.E.2d 363, 368 (Ind.Ct. App.1996).

■ During direct examination of Kalka, the Appellees objected on the basis that Kalka's opinion was based on guesswork and was too unreliable to be admissible. The trial court agreed and excluded the expert's testimony. Court View did not make an offer of proof demonstrating the substance of Kalka's testimony. Therefore, Court View's claim of error is waived on appeal. *See Gouge,* 670 N.E.2d at 368.

■ Waiver notwithstanding, the trial court properly excluded Kalka's testimony. In assessing the admissibility of expert testimony, the trial court considers three requirements.

First, the witness' testimony must be so distinctly related to some science, profession, business or occupation as to be beyond the knowledge of the average lay-person. Second, the witness must have sufficient skill, knowledge or expe-

rience in the field to make it appear that the witness' opinion or inference will aid the trier of fact in the search for the truth. And, third, *the witness must have had sufficient facts or data upon which to validly form an opinion.*

*Burp v. State,* 612 N.E.2d 169, 172 (Ind.Ct. App.1993) (emphasis added) (citations omitted). "[Indiana Evidence Rule] 702(a) assigns to the trial court a gatekeeping function of ensuring that an expert witness' testimony both rests on a reliable foundation and is relevant to the task at hand. Knowledge admissible under the Rule must connote 'more than subjective belief or unsupported speculation.'" *Howerton v. Red Ribbon, Inc.,* 715 N.E.2d 963, 966 (Ind.Ct.App.1999), *trans. denied* (2000).

■ On cross-examination, Kalka indicated that he lacked specific data on which to form an opinion as to the actual cash value of the building. The following colloquy occurred regarding the factors relied upon by Kalka in determining the value of the building.

Q And in this particular case, by no fault of your own, this building was burned down, torn up and a level parking lot when you got to it, right?

A Correct.

Q Okay. So, the only information that you have are these four or five photographs and some conversation with a couple of people, right?

A Yes.

Q Okay. You did not have any information regarding the specific excavation of the property, right?

A No. I believe that we took a—not an average, but an approximation of what it would take to excavate that.

Q So, you guessed?

from the context within which questions were asked.

A Right.

Q Okay. You guessed because you said, "Well, it's a big building," right?

A Well, we had the—we had the square footage.

Q Okay. With regarding the foundation, you were unable to examine the foundation, right?

A Correct.

Q So, that would had to have been a guess, right?

A Right.

Q The specific framing inside of the building, you were unable to examine the framing of the building, right?

A Correct.

Q Okay. So, that would had to have been a guess as well?

A Right.

. . . .

Q Okay. So, those were—basically, with the exception of two things here, your information is either by guesswork or by the examination of these four photos?

A Correct.

. . . .

Q So, this—this whole report is basically a guess?

A Right.

Clearly, Kalka's opinion was based almost entirely upon guesswork. As such, Kalka's testimony lacked a proper foundation and was properly excluded by the trial court.

 Alternatively, Court View argues that the trial court should have ordered a new trial under Trial Rule 50(C) because Kalka's testimony that his opinion was based on guesswork was an unfair surprise. The grant or denial of a new

trial is within the sound discretion of the trial court. *Salcedo v. Toepp*, 696 N.E.2d 426, 432 (Ind.Ct.App.1998). Under Rule 50(C), "the court may grant a new trial as to part or all of the issues in lieu of judgment on the evidence when entry of a judgment is impracticable or unfair to any of the parties or otherwise is improper, whether requested or not."

As noted above, the trial court did not abuse its discretion in excluding Kalka's testimony. Court View's claim of unfair surprise is without merit as Kalka was Court View's own expert. As such, Court View had ample opportunity to determine the bases for Kalka's opinion and could have anticipated the Appellees' attack on cross-examination. Given the lack of probative evidence to support Court View's claim for damages, we cannot say that the trial court abused its discretion in granting judgment on the evidence rather than a new trial.

### III. Replacement Cost Coverage

Court View claims that the trial court erred in granting judgment on the evidence on its claim against the Appellees for failure to procure replacement cost coverage. Specifically, Court View argues that it presented sufficient evidence demonstrating that the Appellees breached the standard of care by failing to seek and procure replacement cost coverage rather than actual cash value coverage. The Appellees contend that they did not have notice that this issue would be litigated during the trial and did not consent to the trial of this issue. Alternatively, assuming that they did consent to litigation of this issue, the Appellees argue that there is no evidence supporting Court View's claim.

Assuming that the Appellees did have adequate notice [7] of the issue of negligence

7. We note that during argument on the motion for judgment on the evidence, Appellees' counsel stated,

in failing to obtain replacement cost coverage, Court View failed to present substantial evidence in support of its claim. *See Glover v. Torrence*, 723 N.E.2d 924, 935 (Ind.Ct.App.2000) ("A party is entitled to some notice that an issue is before the court before it will be determined to have been tried by consent. Both parties must actually litigate the new issue."). Krafft testified that before the building was destroyed by fire, he was satisfied with the terms of the actual cash value coverage policies. Record 331. Court View did not present any evidence that it had been dissatisfied with the coverage in those policies before the fire. It is not until after the fire and loss that Court View complained of the lack of coverage. Further, Court View failed to present any evidence that replacement cost coverage had been available for this specific building.

■ Essentially, Court View asserts that the Appellees breached a fiduciary duty by their negligent failure to advise.

> An insurance agent who undertakes to procure insurance for another is an agent of the insured and owes the insured a general duty to exercise reasonable care, skill and good faith diligence in obtaining insurance. However, the agent's duty may extend to the provision of advice only upon a showing of an intimate long term relationship between the parties or some other special circumstance.

*American Family Mut. Ins. Co. v. Dye*, 634 N.E.2d 844, 847 (Ind.Ct.App.1994), *trans. denied*. However, the insured must show a special relationship that would obligate the insurer to advise him about coverage. *Id.* at 848. Factors demonstrating a special relationship include "(1) exercising broad discretion to service the insured's needs; (2) counseling the insured concerning specialized insurance coverage; (3) holding oneself out as a highly-skilled insurance expert, coupled with the insured's reliance upon the expertise; and (4) receiving compensation, above the customary premium paid, for the expert advice provided." *Id.*

■ Here, Krafft had specific training and knowledge about insurance coverage and had purchased commercial property insurance in the past. Krafft had dealt with other insurance companies prior to his dealings with Bekan. The Appellees were not retained for specialized consultation and were not paid above the customary premium. The parties arranged for insurance coverage via telephone. Court View has failed to demonstrate a special relationship between the parties creating a fiduciary duty on the Appellees to advise Court View regarding various types of coverage.

Krafft contacted Witt and requested that he obtain insurance for the Court View property. At no time did Krafft specifically request that the insurance be for replacement cost. Rather, Krafft indicated that he wanted coverage for $1.5 million, which Witt obtained. After receiving the policies, Krafft did not complain that they were actual cash value policies, but accepted the policies and their terms. Therefore, Court View failed to present substantial evidence of probative value

> Now, the last thing that the Plaintiff could take a shot at is to say, "Well, there should have been replacement cost coverage, and, therefore, that's our damages. More than what we really said in our Complaint, more than what we've ever said, more than anything," throwing out the Plaintiff's testimony that said he was satisfied with these first two.
> Assume he never testified that way. Then, the next thing they'd have to show is that they—that actual—that a replacement cost policy could have been purchased.

that the Appellees were negligent for failing to seek or obtain replacement cost coverage, and therefore, judgment on the evidence was proper.

Affirmed.

ROBB, J., and MATHIAS, J., concur.