**Donald W. MYERS and Sandra F. Myers, as Individuals and as Husband and Wife, Appellants–Plaintiffs,**

v.

**Andrew W. YODER, d/b/a CLS Construction, Amy Krueger, An Individual, Bixler Insurance, Inc., An Indiana Corporation, and Cincinnati Insurance Company, Appellees–Defendants.**

No. 01A02–0906–CV–539.

Court of Appeals of Indiana.

Feb. 25, 2010.

Bruce Norman Stier, Logan & Stier, LLC, Fort Wayne, IN, Attorney for Appellants.

Michael E. Brown, Eric D. Johnson, Kightlinger & Gray, LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

BAKER, Chief Judge.

Appellants-plaintiffs Donald W. Myers and Sandra F. Myers (collectively, the Myerses) appeal the trial court's grant of summary judgment in favor of appellees-defendants Amy Krueger, Bixler Insurance, Inc. (Bixler), and Cincinnati Insurance Company (Cincinnati Insurance) (collectively, the appellees), regarding the Myerses' claim that the appellees were negligent in failing to advise them about their homeowner's insurance policy.[1] Specifically, the Myerses argue that a genuine issue of material fact exists as to whether the appellees breached their respective duties to provide adequate coverage to them.

Concluding that the trial court properly entered summary judgment in favor of the appellees, we affirm.

## FACTS

In 1998, the Myerses were in the process of building a residence in Adams County. At some point, they contacted Deryll Zurcher to obtain insurance for their home. The Myerses knew Zurcher from church and wanted to "give him the business on the house." Appellants' App. p. 40–41. At the time, Zurcher was an agent with the Insurance Haus.

Zurcher wrote a builder's risk policy for the Myerses with the Lake States Insurance Company (Lake States) for $102,000, which was the amount that the Myerses stated was the cost of the house after construction was completed. When the policy was written, Krueger worked for Zurcher as a customer service representative and performed filing, typing, and other clerical tasks.

After the house was fully constructed in 1999, Zurcher completed a replacement cost estimator on the residence, which indicated that the replacement cost of the residence would amount to $124,000. As a result, Lake States issued a homeowner's policy to the Myerses in that amount. In 2000, a homeowner's policy was renewed with policy limits of $128,000. Shortly after the renewal, Zurcher left the insurance industry and Krueger became an insurance agent for Bixler. Krueger then solicited Zurcher's former clients, including the Myerses. Krueger converted the Myerses' homeowner's policy from Lake States to Cincinnati Insurance because Bixler did not offer insurance through Lake States. As a result of the conversion, the policy limits were increased to $130,000 for a three-year term. In 2003, the Myerses' homeowner's policy with Cincinnati Insurance renewed again with an increase in limits to $136,000.

Although Sandra could not recall having a conversation with Krueger when she learned that Zurcher was leaving the insurance business, she assumed that she gave Krueger approval for the Cincinnati Insurance policy. However, Sandra "knew" that she had communicated to Krueger that she wanted "full coverage" on the house. Appellants' App. p. 83. Russell Flueckiger, the owner of Bixler, believes that when a customer requests "full coverage," the agent should ask questions about the use of that term. *Id.* at 148–49.

1. Defendant Andrew W. Yoder, d/b/a CLS Construction, is not a party to this appeal.

Flueckiger and Krueger both believed that the insurance industry recommends that new policies be issued only after a replacement cost estimator is performed. A replacement cost estimator is used to determine a home's replacement value before homeowner's insurance is issued. Flueckiger admitted that it is a good practice to perform a replacement cost estimator before extending homeowner's coverage.

Although the Myerses believed that the Cincinnati Insurance policy provided "full coverage" on their residence for any loss, no replacement cost estimator was ever performed by Krueger or Bixler before the Cincinnati Insurance homeowner's policy was issued.

Sandra had one other conversation with Krueger in July 2004. In particular, Sandra inquired about insuring a shed on the property. Sandra told Krueger that the shed cost $25,000 to build and Krueger responded that, based on the Myerses' homeowner's policy, the coverage on the residence would have to be increased to insure the shed for the amount paid.

In August 2004, the Myerses hired CLS Construction (CLS) to dig a trench on their property. According to the Myerses, CLS negligently cut a propane line that caused the gas to leak into the basement. Thereafter, the Myerses' home and contents were destroyed when the gas in the basement exploded.

The Myerses filed a claim under their Cincinnati Insurance policy for the replacement value of the home. Although the amount of the policy was $136,000, it was determined that the cost of replacing the home alone totaled nearly $223,594.34. Thus, the Myerses sustained a loss in the amount of $87,592.34.

Following the incident, the Myerses filed a complaint against CLS, claiming that it was negligent and reckless in operating the trencher. The Myerses also alleged that Krueger and Bixler were negligent in issuing the homeowner's policy because they failed to "follow ... industry standards in determining the appropriate coverage for the value of [the] home and its contents." Appellants' App. p. 20. The Myerses also argued that Cincinnati Insurance was negligent "in receiving and accepting incomplete and inaccurate information and then issuing an insurance policy which provided inadequate coverage to Plaintiffs." *Id.*

After denying the allegations, the appellees moved for summary judgment, arguing that they were entitled to judgment as a matter of law because they did not owe the Myerses a duty to advise them as to the amount for which they should insure their house. More particularly, the appellees argued that the standard relationship between the agent and insured is not sufficient to create an obligation on the agent to advise the insured of the type or amount of coverage needed. The appellees maintained that the undisputed evidence established that no intimate, long-term relationship or other special relationship existed between Krueger and the Myerses so as to impose a duty on the appellees to determine the amount of coverage that the Myerses needed.

In response to the motion for summary judgment, the Myerses filed the affidavit of insurance expert, Dr. Marshall Reavis. Dr. Reavis averred that insurance industry standards recommend that new policies be issued only after a replacement cost estimator is performed. *Id.* at 181. The trial court admitted the affidavit over the appellees' objections, and following a hearing, the trial court granted the motion for summary judgment. The trial court's order provided in pertinent part that

16. The Court has not granted Bixler and Krueger's Motion to Strike the affidavits of Reavis, but the arguments in support of that motion are very relevant in regards to the decision in regards to a summary judgment.

17. The real question is: Do the affidavits and the attachments thereto establish the requisite experience and knowledge to testify in regards to the standard of care for insurance agents in Indiana and, in particular, the necessity to complete a replacement cost estimator prior to issuing a homeowner's policy. The Court thinks not.

18. In this case, a replacement cost estimator was utilized to determine the replacement cost of the home in 1999 and the cost was determined to be $124,000.00 and later the next year, October 11, 2000, the policy was written by Cincinnati for $130,000.00.

19. Cincinnati did not require a replacement cost estimator.

20. No case law was provided indicating that the standard of care for insurance agents in Indiana requires an agent to complete a replacement cost estimator.

21. It is true that Myers had several contacts with Krueger, including the contact at the Insurance Haus and later with Bixler, but the Court finds that there was not an intimate, long-term relationship that would be required to create a duty to advise Myers in regards to the amount of insurance. Very simply, Myers was aware of the amount of coverage, was paying premiums based upon said coverage and the relationship between Myers and Krueger and Bixler did not create the duty to advise Myers regarding the amount of insurance needed.

22. Myers indicates that when the construction of the home was initially completed, she requested full coverage because she just had builders risk or other insurance, so she needed full coverage on the home now that it was finished. . . . There was a discussion in regards to the amount of coverage and a replacement cost estimator was completed by Zurcher as mentioned above, and a policy was issued by Lake States in the amount of $124,000. The Court finds once again that the facts presented in the exhibits do not create a duty to advise Myers in regards [to] the value of the home, its replacement cost or the amount of insurance needed.

23. The court finds that the Reavis affidavits failed to demonstrate that a genuine issue of fact exists and, therefore, the Court finds in favor of Bixler and Krueger and grants their Motion for Summary Judgment.

*Id.* at 15–17. The Myerses now appeal.

## DISCUSSION AND DECISION

### I. Standard of Review

■ The purpose of summary judgment is to terminate litigation for which there can be no factual dispute and which can be determined as a matter of law. *Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1261 (Ind.Ct.App.1993). When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1269 (Ind.2009). Considering only those facts that the parties designated to the trial court, we must determine whether there is a genuine issue as to any material fact and whether the moving party is entitled to a judgment as a matter of law. *Id.;* Ind. Trial Rule 56(C). In answering these questions, we construe all factual inferences in the non-moving party's favor and resolve all doubts as to the existence of a material issue against the moving party.

*N. Ind. Pub. Serv. Co. v. Bloom,* 847 N.E.2d 175, 180 (Ind.2006).

■ The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Once the movant satisfies that burden, the burden shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact. *Mullin v. Mun. City of South Bend,* 639 N.E.2d 278, 281 (Ind.1994). A grant of summary judgment will be carefully reviewed to ensure that a party was not denied his or her day in court. *Evan v. Poe & Assocs., Inc.,* 873 N.E.2d. 92, 97–98 (Ind.Ct.App.2007). If there is any doubt as to which conclusion a jury might reach, summary judgment is inappropriate. *Asbestos Corp. v. Akaiwa,* 872 N.E.2d 1095, 1096 (Ind.Ct.App.2007).

■ Finally, we do not owe deference to the findings and conclusions entered by the trial court in a summary judgment order. *Trans–Care, Inc. v. Comm'rs of County of Vermillion,* 831 N.E.2d 1255, 1258 (Ind.Ct.App.2005). Although such findings and conclusions may assist our review, we will affirm if the trial court's grant of summary judgment can be sustained on any theory or basis in the record. *Beck v. City of Evansville,* 842 N.E.2d 856, 860 (Ind.Ct.App.2006).

## II. The Myerses' Claims

The Myerses argue that the trial court erred in granting the appellees' motion for summary judgment because a genuine issue of material fact exists as to whether the appellees breached the duty of care that it owed to them. More specifically, the Myerses assert that because they requested "full coverage" on their homeowner's replacement policy and the designated evidence established that the insurance companies and their agents failed to follow their instructions, the trial court erroneously granted summary judgment in the appellees' favor.

■ In resolving this issue, we initially observe that an insurance agent who undertakes to procure insurance for another owes the principal a general duty to exercise reasonable care, skill and good faith diligence in obtaining the insurance. *Am. Family Mut. Ins. Co. v. Dye,* 634 N.E.2d 844, 847 (Ind.Ct.App.1994); *Craven v. State Farm Mut. Auto. Ins. Co.,* 588 N.E.2d 1294, 1296 (Ind.Ct.App.1992). On the other hand, an insurance agent's duty does not extend to providing advice to the insured unless the insured can establish the existence of an intimate, long-term relationship with the agent or some other special circumstance. *Craven,* 588 N.E.2d at 1296. In other words, something more than the standard insurer-insured relationship is required to create a special relationship obligating the agent to advise the insured about coverage. *Dye,* 634 N.E.2d at 848.

■ Factors demonstrating the existence of a special relationship between the agent and insured include whether the agent: 1) exercised broad discretion in servicing the insured's needs; 2) counseled the insured concerning specialized insurance coverage; 3) held himself out as a highly-skilled insurance expert; or 4) received compensation for the expert advice provided above the customary premium paid. *Court View Centre, LLC v. Witt,* 753 N.E.2d 75, 87 (Ind.Ct.App.2001). While the question of whether the relationship gives rise to such a duty may involve questions of fact, whether an insurance agent owes the insured a duty to advise based on undisputed facts is a question of law for the court. *Dye,* 634 N.E.2d at 848. The burden of establishing an intimate long-

term relationship or other special circumstance is on the insured. *Id.*

Illustrative of these principles is *Craven,* where the plaintiff approached a State Farm agent to discuss automobile insurance. *Id.* at 1297. Afterwards, State Farm issued a policy with bodily injury coverage of $100,000 per person and $300,000 per accident, with uninsured motorist coverage of $25,000 per person and $50,000 per accident. *Id.* Five months after the policy was issued, the plaintiff was involved in an accident with an uninsured motorist. *Id.* State Farm paid the plaintiff the $25,000 limit of her uninsured motorist coverage, but denied any additional coverage. *Id.* After attempts to negotiate failed, the plaintiff sued her agent, claiming—among other things—that he failed to advise her that she was buying only $25,000 uninsured motorist coverage, that $25,000 was less uninsured motorist coverage than that afforded under her previous policy, and that she could purchase more than $25,000 of uninsured motorist coverage. *Id.*

The trial court entered summary judgment against the Plaintiff. On appeal, after noting that a duty to advise only exists when there is an "intimate long-term relationship between the parties or some other special circumstance," *id.* at 1297, we determined that the agent did not have any duty to advise the plaintiff regarding coverage and made the following observations:

> The pleadings reveal only that [the plaintiff] approached [the insurance agent] to discuss the purchase of automobile insurance, and that [the insurance agent] duly procured the policy from State Farm. Nowhere in the pleadings does [the plaintiff] allege the [insurance agent] was her insurance agent prior to the instant transaction, that she requested information about the terms

of the uninsured motorist coverage, that she paid [the insurance agent] additional compensation for his advice, or that any other facts exist which would establish [the insurance agent] had a duty to advise [the plaintiff] about her insurance needs.

*Id.* at 1298.

In *United Farm Bureau Mut. Ins. Co. v. Cook,* 463 N.E.2d 522 (Ind.Ct.App.1984), we explored the factors that must be considered in determining whether an insurance agent is under a duty to advise the insured about coverage. In *Cook,* the plaintiff purchased horse barns in Kentucky that he needed to dismantle and transport to Indiana where they were to be reassembled. *Id.* at 524. The plaintiff leased a crane for purposes of reassembling the barns. *Id.* While the barns were being reassembled, the crane overturned. *Id.* The owner of the crane sued, and the plaintiff was held personally liable for the damage to the crane. *Id.* The plaintiff then sued his insurance agent, contending that the agent negligently failed to advise him regarding his insurance needs. *Id.*

In determining whether the agent owed the plaintiff a duty to advise him regarding his insurance needs, we considered the following:

> Cook is a surgeon in New Albany, Indiana, who has managed a horse farm as a sideline for approximately twelve years prior to trial. Cook became associated with Browning, an insurance agent, when he purchased the farm. Subsequently, Browning provided all the insurance coverage related to Cook's farm. Cook is not knowledgeable about potential risks related to his farm and he would consult Browning about potential risks related to his farm and the necessary insurance to cover these risks. Cook would ask Browning for all coverage pertinent to his farm and leave the

details to Browning's discretion. Browning would subsequently bill Cook for the coverage selected. Browning was aware that Cook relied on his advice to cover risks related to the farm and both men considered Browning to be Cook's "insurance agent" for the farming operation.

In 1978, Cook became aware of the opportunity to purchase two large horse barns located in Kentucky. These barns were standing structures which would have to be dismantled and moved. Prior to undertaking the project, Cook discussed it with his employee who worked on the farm, with his wife and with Browning. After deciding to purchase the barns, Cook signed two sales contracts, the first on November 21, 1978, and the second on February 14, 1979. Both contracts contained language that Cook would assume liability for the dismantling project. . . .

In early February, 1979, Cook went to Browning's office to discuss his insurance coverage. Cook was concerned about risks related to moving the barns and the adequacy of his coverage. He wanted all his potential risks covered. Customarily, Cook and Browning dealt with each other by telephone, but because he had never undertaken a similar project, Cook decided to visit Browning in his office to discuss the project. Cook explained to Browning that the barns would have to be dismantled and moved to Indiana with the use of contract labor and rental equipment including a crane. Cook wanted liability coverage for property damage, personal injury and the materials in the barns. He placed an order for coverage, apparently an oral request. Browning told Cook he could not write coverage for the components of the barns while they were in Kentucky. According to Cook, this was the only denial of coverage he received, how-

ever, Browning did not state what the extent Cook's coverage would be. He also did not deny he could provide the remaining coverage and he did not refer Cook to another agency.

*Id.* at 524–25. After the incident, Cook filed a claim, but the insurer denied coverage. *Id.* at 526. In determining that the agent had a duty to advise Cook regarding appropriate coverage, we observed that

> Browning himself conceded that he was Cook's insurance man and that Cook relied on his advice in purchasing insurance. Additionally, by Browning's own admission, his role went beyond that of a mere agent and he counseled Cook on the appropriate coverages for his horse farm. This case stands in marked contrast to *Bulla [v. Donahue,* 174 Ind.App. 123, 366 N.E.2d 233 (1977)] for example, where the plaintiff had never done business with the insurance agent prior to the disputed transaction. *In the case at bar, a long-established relationship of entrustment had developed between the insured and agent, and Browning exercised broad discretion to service Cook's insurance needs.*

*Id.* at 528 (emphasis added).

■ When examining the circumstances in *Cook* and *Craven,* the undisputed evidence demonstrates that no intimate, long-term relationship or other special relationship existed between Krueger and the Myerses. For instance, Krueger was not the Myerses' regular insurance agent and the Myerses had not previously used Krueger or Bixler to obtain insurance for other matters. Appellants' App. p. 44–45. In fact, the Myerses' policy was written with Bixler only because Zurcher—an agent they knew through their church—decided to leave the insurance business. *Id.* at 40–42, 44.

According to Sandra, she spoke to Krueger on only one occasion regarding the coverage limits under the Cincinnati Insurance policy, which occurred when Sandra inquired about adding coverage for the shed to the homeowner's policy. *Id.* at 45. During that conversation, Sandra informed Krueger of the cost of the shed and Krueger indicated that, based on the Myerses' policy, the coverage on the house should be increased to insure the shed for the amount that the Myerses paid to have it built. *Id.* at 49. Moreover, Sandra did not recall having a particular discussion with Krueger when the Cincinnati Insurance policy was issued or renewed. *Id.* at 45.

In light of the above, it is apparent that the circumstances here closely parallel those in *Craven* where no duty was found. And the facts here are unlike those in *Cook* where the evidence in that case demonstrated that the insured and the agent had numerous conversations and contacts regarding the type and amount of insurance coverage that was needed.

Similarly, we cannot say that any other special circumstances are present here that would justify imposing a duty on the appellees to provide the Myerses with advice as to the amount of homeowner's insurance coverage that was needed. The Myerses did not consult with Krueger regarding any special insurance needs, and their only contact with her amounted to a general request for a homeowner's policy without further discussion. Moreover, the homeowner's policy that Krueger obtained for the Myerses through Cincinnati Insurance contained the same policy limits that Zurcher had previously determined. *Id.* at 48–49.

The undisputed evidence also belies any notion that Krueger or Bixler ever counseled the Myerses concerning any specialized insurance coverage. Before the homeowner's policy was issued, the Myerses had not consulted with Krueger or any other Bixler agent for obtaining other forms of insurance prior to the homeowner's policy. Again, Krueger had one conversation with Sandra concerning the coverage on her home when Sandra called to inquire about adding a shed to the policy. Indeed, Sandra could not recall ever having a discussion with Krueger when the Cincinnati Insurance policy was issued or renewed. Sandra also admitted that Krueger never advised her of the type or amount of insurance that she would need. Appellants' App. p. 46.

There is also no evidence that Krueger or Bixler held themselves out as highly-skilled insurance experts. The Myerses have not shown that Krueger ever made any representations about her abilities to them, and there is no evidence that the Myerses chose Krueger or Bixler to handle their homeowner's insurance on the basis that Krueger or Bixler held themselves out as experts. Moreover, Krueger never advised Sandra regarding the type or amount of insurance that should be obtained. *Id.* at 46. Rather, the evidence supports a conclusion that the Myerses chose to use Zurcher because of their association with him through their church. And the Myerses retained their policy with Krueger at Zurcher's suggestion. *Id.* at 42.

Notwithstanding these circumstances, the Myerses assert that because Sandra requested "full coverage" for the residence, a duty was imposed on the appellees to determine what she meant in making that statement. Appellants' Brief, pp. 11–12. To support that contention, the Myerses rely on Flueckiger's testimony that the request for "full coverage" created a "red flag" and that based on this "red flag," Krueger should have made additional inquiry about the type and amount of

insurance that should be purchased. *Id* at 148–49. However, we cannot say that Sandra's request for "full coverage" approximates the circumstances in *Cook* where the insured expressly requested the agent to provide insurance to cover specific potential occurrences. Moreover, we have recently determined that an insured's expectation of "full coverage" is not enough to impose a duty on an agent to provide advice to an insured regarding the amount of coverage that should be purchased. *Barnes v. McCarty,* 893 N.E.2d 325, 329 (Ind.Ct.App.2008), *trans. denied.* Courts from other jurisdictions have held the same. *See e.g., Catalanotto v. Commercial Mut. Ins. Co.,* 285 A.D.2d 788, 790, 729 N.Y.S.2d 199, 202 (2001) (citing New York cases concluding that phrases such as "coverage on everything," "fully insured," "full coverage," "best available," and "good coverage," are insufficient requests to specify the particular desired coverage); *Trotter v. State Farm Mut. Auto. Ins. Co.,* 297 S.C. 465, 377 S.E.2d 343 (S.C.Ct.App. 1988) (cited with approval in *Craven,* where it was determined that "a request for 'full coverage', the 'best policy', or similar expressions does not place an insurance agent under a duty to determine the insured's full insurance needs, to advise the insured about coverage, or to use his discretion and expertise to determine what coverage the insured should purchase"); *Ethridge v. Associated Mut., Inc.,* 160 Ga. App. 687, 288 S.E.2d 58 (1981) (same).

In our view, such a rationale gives effect to the public policy that "places the risk of loss on he who is best able to avoid that loss." *Provident Bank v. Tri–County Southside Asphalt, Inc.,* 804 N.E.2d 161, 165–66 (Ind.Ct.App.2004). As the Georgia Court of appeals observed in *Ethridge:*

> To hold otherwise would allow a damaged insured to make a "fully covered" allegation against an insurance agency each time an insurance policy did not cover a particular type of loss. To protect against such claims, perforce this would place upon an agency the duty of intuitive foresight and an explanation of every term, condition, limitation, exclusion or restriction in coverage to an insured so that the policy might provide "full coverage" under any and all circumstances. We will not place such an impossible burden upon an insurance agency but (at least in cases based on contract) we will leave the burden upon the insured to examine his policy and determine if the coverage desired is provided.

160 Ga.App. at 689, 288 S.E.2d at 59.

If the rule was otherwise and the responsibility of determining and calculating the proper amount of homeowner's insurance was shifted to the insurance companies and its agents, it is likely that a raft of litigation would ensue whenever coverage miscalculations occurred. Thus, the cost of homeowner's insurance coverage would rise and those costs would undoubtedly be passed on to the consumer. In light of these concerns, there is no justification for imposing such a sweeping duty on insurance agents and/or their companies.

■■■ Finally, the Myerses assert that an insurance industry practice to perform a "replacement cost estimator" before issuing a homeowner's policy establishes what is required of the "reasonable" insurance agent. Appellants' Brief, p. 13. Thus, the Myerses contend that the appellees acted unreasonably in issuing the homeowner's policy without performing the replacement cost estimator.

■■■ Although couched in terms of what amounts to "reasonable care" when issuing an insurance policy, the Myerses' argument has been rejected by our Supreme Court as an attempt to impose a duty to advise under the guise of the gen-

eral duty of care owed by an insurance agent. Specifically, as was determined in *Filip v. Block,* 879 N.E.2d 1076, 1083–84 (Ind.2008):

> [t]he general duty of the insurer's agent is to refrain from affirmative fraud, not to watch out for all rights of the insured and inform the latter of them.... *[I]nsurer's agents are not required under a general duty of care to advise the insured regarding the sufficiency of coverage limits or replacement value of insured's home[s].*

(Emphasis added). Although the Myerses argue that Dr. Reavis's affidavit establishes that it is standard practice in the insurance industry to perform replacement cost estimations and, therefore, a genuine issue of material fact exists, *Filip* rejects that assertion and establishes that insurers are not under a duty to perform such an estimate. In short, the Myerses' argument falls squarely within the principles set forth in *Filip* and their claim fails.

## CONCLUSION

In light of our discussion above, we conclude that there was no long-standing, intimate relationship between the Myerses and the appellees that would justify imposing a duty on the appellees to advise the Myerses' about the amount of homeowner's insurance that they needed for the residence. Moreover, the Myerses have failed to identify any special circumstances that might justify the imposition of such a duty. Thus, the trial court properly entered summary judgment for the appellees.

The judgment of the trial court is affirmed.

BAILEY, J., concurs.

ROBB, J., concurs with opinion.

ROBB, Judge, concurring.

I concur in the majority opinion, but write separately to note that although an insurance agent does not have a duty to provide advice to the insured unless a special relationship exists between the two, see op. at 885–86 (citing *Craven,* 588 N.E.2d at 1296), I do not view every instance of an insured requesting "full coverage" to be a request for advice, however. In some instances, an insured's declaration that he wants "full coverage" could be a directive to procure specific insurance, akin to directing the agent to procure "earthquake insurance" or "flood insurance." A licensed insurance agent would then have a duty to exercise reasonable care, skill and good faith diligence to obtain the desired insurance. *Morgan v. Tackitt Ins. Agency, Inc.,* 852 N.E.2d 994, 999 (Ind.Ct.App.2006). If the agent is unsure what the insured means by the directive, the duty may include a duty to ask for clarification. Likewise, if the agent is unable to obtain the desired insurance, there is a duty to inform the insured of that fact. *Anderson Mattress Co., Inc. v. First State Ins. Co.,* 617 N.E.2d 932, 939 (Ind.Ct.App.1993) ("The agent also incurs a duty to inform the principal if he is unable to procure the requested insurance.").

In this case, however, upon reviewing the entire conversation between the Myerses and Krueger, it is clear that Sandra did not have a clear idea of what "full coverage" meant and was not directing Krueger to procure specific insurance but was seeking Krueger's advice about what amount of insurance would provide full coverage for the replacement cost of the home. *See* Appellants' App. at 81 (Sandra's deposition testimony that Krueger "asked me how much insurance I wanted on it and I told her I didn't know. I had no clue how much insurance I needed."). On the facts of this case, I concur with the

majority that Krueger had no duty to advise the Myerses about the amount of insurance they needed and the trial court properly granted summary judgment for the appellees.