In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1924

BILLY J. CUNNINGHAM and MARY ANN CUNNINGHAM,

*Plaintiffs-Appellants*,

*v.*

MASTERWEAR CORPORATION, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:04-CV-01616-LJM-WTL—**Larry J. McKinney**, *Judge*.

ARGUED OCTOBER 29, 2008—DECIDED JUNE 23, 2009

Before POSNER, MANION, and KANNE, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs, a couple named Cunningham, appeal from the dismissal, on the defendants' motion for summary judgment, of a suit for common law nuisance. Jurisdiction is founded on diversity of citizenship. Indiana law would govern the substantive issues if there were any—but the only issues presented by the appeal are procedural.

From 1986 to the beginning of 2004, the plaintiffs operated a photographic studio in Martinsville, Indiana. The studio was next door to a building that until 1991 had contained a dry-cleaning business operated by defendant Masterwear. (The other defendants are Masterwear's owners, and can be ignored.) In 1994 the plaintiffs began living in the building that housed their studio. Soon they began having severe headaches, plus a hacking cough in the case of Mr. Cunningham and asthma in the case of his wife. In December 2003, the EPA warned them that their building contained perchloroethylene (PCE) vapors in a concentration of 200 parts per billion and that "this amount of the compound could be significant and pose a health concern over the long term." The vapors were apparently the result of improper storage of chemicals by Masterwear. Upon receiving the letter the plaintiffs moved out of the building and put it up for sale. (It was sold the following year.) They claim not to have had the symptoms of which they complain before they lived in the building and that after they moved out the symptoms diminished.

They seek damages both for the damage to their health and for what they contend is the depressed price at which they were forced to sell the property because of its contamination. The district court granted summary judgment for the defendants after disqualifying the plaintiffs' expert medical witness under Fed. R. Evid. 702 and ruling that the hearsay rule barred the plaintiffs from testifying about the valuation of their property by appraisers.

When ruling on whether the plaintiffs' medical expert, Dr. D. Duane Houser, a physician who specializes in the treatment of respiratory diseases, would be permitted to testify about the cause of the symptoms about which the plaintiffs complain, the judge had before him Dr. Houser's expert report plus deposition testimony. From these materials and Houser's curriculum vitae we learn that he is an experienced physician who has never however treated a respiratory illness caused or aggravated by exposure to PCE. He has nevertheless formed the definite opinion that all the symptoms of which the plaintiffs complain were caused by that exposure. A test of air samples in the plaintiffs' home in 1996 found that the air contained a level of PCE far above what the Indiana environmental agency considers the safe level of exposure to the chemical. (The plaintiffs say they were not told the results of the study and that if they had been told they would not have waited until 2004 to move out.) The EPA found that the concentration of PCE in the plaintiffs' home in September 2003 was lower than it had been in 1996; but it still was higher than the Indiana agency considers safe. Apparently the EPA has not made its own determination of what the maximum safe level is, beyond the warning in its letter to the plaintiffs that "this amount of the compound [the amount in their building] could be significant and pose a health concern over the long term."

Even if the plaintiffs were exposed to an unsafe level of PCE, it would not follow that it was the cause of their ailments. One would have to know what the specific dangers were that had led the Indiana department to

pick the safe level it did; and about that, Houser's report and testimony are silent. Suppose that a concentration of some chemical above a certain level has been found to increase the incidence of birth defects, and as a result that level is fixed as the maximum safe level of exposure to the chemical; a person who was exposed to a higher level of the chemical and developed asthma could not attribute his ailment to his exposure.

Houser is not a toxicologist and did not present, either directly or by citation to a scientific literature, a theory that would link the level and duration of the exposure of the plaintiffs to PCE to their symptoms. He did cite a report by the United States Agency for Toxic Substances and Disease Registry which states that "levels of 216 ppm [parts per million] [of PCE] or more produce respiratory tract irritation" and that headaches "have been observed at exposures of 100 to 300 ppm." But the plaintiffs were exposed to only 200 parts per *billion*, which is only one-fifth of one part per million. Moreover, the report lists a variety of ailments unrelated to the plaintiffs' ailments that exposure to PCE can cause, and for all we know it is those ailments that motivated Indiana's selection of a "safe" level of exposure. Houser thus presented no evidence from which a trier of fact could infer that the plaintiffs' exposure to PCE is likely to have contributed significantly (or for that matter at all) to their ailments.

The alleged impairment of the value of the plaintiffs' property presents a separate issue—contamination can reduce property values without endangering anybody's health. But like the health issue, causation turns out to be the plaintiffs' Achilles heel.

Mr. Cunningham wanted to testify that the value of the property had fallen from $135,000 to $105,000 (the price at which it was sold) as a result of its contamination by PCE; that $135,000 was the appraised value of the building in 1999 and was the price at which he and his wife listed it for sale when they moved out; that when no offers materialized, their real estate agent explained that prospective buyers were concerned about the building's being contaminated; that he had convinced the Cunninghams to lower the list price to $115,000; and that after receiving two low offers they had finally sold the property, after it had been on the market for more than a year, for $105,000. The judge excluded all this testimony.

The testimony about what the real estate agent thought the property worth and what prospective buyers had told the agent would have been inadmissible hearsay. It is true that Indiana law allows a property owner to testify to the value of his property, provided that he can offer some factual basis for his valuation; with that proviso, it is regarded as a matter within his personal knowledge. *Crider & Crider, Inc. v. Downen*, 873 N.E.2d 1115, 1120 (Ind. App. 2007); *Court View Centre, L.L.C. v. Witt*, 753 N.E.2d 75, 82 (Ind. App. 2001); *Jordan v. Talaga*, 532 N.E.2d 1174, 1188 (Ind. App. 1989). And though, with immaterial exceptions, evidentiary issues that arise in cases litigated in federal courts are governed by the Federal Rules of Evidence rather than by state rules of evidence even when federal jurisdiction is based on diversity of citizenship, e.g., *Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007), the federal rules, like Indiana's rules, have been interpreted to permit a property owner

to testify about the value of his property. He can testify about it either as a matter within his personal knowledge, *United States v. Conn*, 297 F.3d 548, 554 n. 2 (7th Cir. 2002); *Christopher Phelps & Associates, LLC v. Galloway*, 492 F.3d 532, 542 (4th Cir. 2007); *Asplundh Mfg. Division v. Benton Harbor Engineering*, 57 F.3d 1190, 1197-98 (3d Cir. 1995), or, if he is an expert on property values, as an expert witness, e.g., *United States v. 68.94 Acres of Land*, 918 F.2d 389, 397-98 (3d Cir. 1990); *United States v. 10,031.98 Acres of Land*, 850 F.2d 634, 636-37 (10th Cir. 1988)—which Cunningham however was not.

What the owner is not allowed to do is merely repeat another person's valuation, *United States v. 68.94 Acres of Land*, *supra*, 918 F.2d at 398, which was what Cunningham wanted to do. Nor was what prospective buyers told the real estate agent within Cunningham's personal knowledge. More important, he could not offer a responsible opinion about the *cause* of a change in the value of his property. Even if he knew its value at time $x$ and at time $x + y$, he had no basis for testifying to what caused its value to fall. That would depend, at a minimum, on whether the prices of comparable properties had fallen by a comparable amount.

It does seem highly likely that the discovery of contamination would make the market value of a building fall, though this is not certain because real estate prices might be rising—in fact the plaintiffs sold the building during the housing bubble of the early 2000s whose later bursting plunged the economy into its present doldrums. Sold it, as we know, for $105,000, but they had bought in back in 1992 for only $50,000.

The critical question is how much they could have sold the building for had it not been for the contamination. Suppose that during the period in which the value of the plaintiffs' property fell by 22 percent (from $135,000 to $105,000), it would have fallen by 12 percent had there been no contamination; then only a 10 percent change in the value of the property would be attributable to the contamination. The plaintiffs needed evidence by a real estate agent or real estate appraiser to establish the effect of the contamination on the value of their property. They did not attempt to present any such evidence.

In short, they failed to prove either personal injury or property damage, and the district court was therefore right to dismiss the case.

AFFIRMED.