In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3448

C.W. and E.W., by Guardians and Next Friends
ADELE A. WOOD and JASON A. WOOD,

*Plaintiffs-Appellants,*

*v.*

TEXTRON, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:10 CV 87 — **Philip P. Simon**, *Chief Judge.*

ARGUED MAY 18, 2015 — DECIDED AUGUST 26, 2015

Before KANNE and SYKES, *Circuit Judges,* and Ellis, *District Judge.*[*]

KANNE, *Circuit Judge.* Government regulators and scientists agree: exposure to vinyl chloride poses serious health

[*]The Honorable Sara L. Ellis, of the United States District Court for the Northern District of Illinois, sitting by designation.

risks to humans. Vinyl chloride is a known carcinogen, mutagen, and genotoxin.[1] But in what quantity and for how long must a human—in this case, two infant children—be exposed to vinyl chloride before those health risks materialize? The experts for C.W. and E.W., the minor children of Jason and Adele Wood, attempted to answer these difficult questions in this toxic-tort case.

Unfortunately for the Woods, their attempts fell short. The district court excluded each of the appellants' experts, observing they did not use reliable bases to support their opinions. Having excluded the appellants' experts, the district court then granted summary judgment in favor of Textron. It found that, without the experts' opinions, the appellants could not prove general and specific causation—required elements under Indiana law in a toxic-tort case. Although we disagree with the district court's rationale regarding causation, we nevertheless affirm.

## I. BACKGROUND

*A. Preliminary History*

Textron began operations at its fastener manufacturing plant in Rochester, Indiana, in 1954. The Torx plant, as it came to be known, proved to be successful; it remained in operation through 2006. During its operations, however, the

---

[1] For the sake of clarity (primarily our own), we define scientific terms as the need arises. This occasion presents such a need. In reverse order: a genotoxin is a poisonous substance that damages DNA; a mutagen is something that is capable of causing mutations to DNA; and a carcinogen is something that causes cancer. MedicineNet.com Home Page, *available at* search.medicinenet.com (last visited Aug. 5, 2015).

plant released vinyl chloride—a toxic gas. That vinyl chloride eventually seeped into the ground water, contaminating nearby residential wells.

One of those wells belonged to the Woods. Both Textron and the Indiana Department of Environmental Management performed testing on the Woods' well. Their tests revealed varying levels of vinyl chloride—from 5.00 and 8.40 parts per billion to 8.60 and 9.00 parts per billion.[2]

Once the Woods learned that this toxic substance had contaminated their well, they understandably left immediately. Jason and Adele believed the health risks to their children were simply too high to remain at the Rochester house. But in the Woods' opinion, there was more at stake than the future risk of cancer; there was the present risk of illness. While living at the Rochester house, C.W. and E.W. experienced gastrointestinal issues (vomiting, bloody stools), immunological issues, and neurological issues.

The Woods adopted their son, C.W., when he was eleven weeks old. He came home on May 11, 2007. The Woods adopted their daughter, E.W., when she was eleven days old. She came home on April 25, 2008. Both children were younger than two years old when the entire family left the Rochester house in November 2008. Their illnesses coincided with their time spent in that house.

After the Woods moved from that house, C.W.'s and E.W.'s health improved. But the parents' concerns did not abate. Fearful that vinyl chloride caused C.W.'s and E.W.'s

---

[2] The appellants' experts later estimated that C.W. and E.W. ingested water contaminated by vinyl chloride at 3 parts per billion.

conditions (and mindful of the known cancer risks), Jason
and Adele sued Textron on behalf of their children in Fulton
County Circuit Court. There, they advanced a three-count
complaint, alleging negligence, negligence *per se*, and negli-
gent infliction of emotional distress.[3] The crux of these Indi-
ana tort-law claims was that Textron exposed C.W. and E.W.
to vinyl chloride, which caused their illnesses and substan-
tially increased their risk of cancer and other adverse health
effects. Just one week after the filing of the complaint, Tex-
tron successfully removed the case to federal court. 28 U.S.C.
§§ 1332, 1441, 1446. The appellants then filed a Second
Amended Complaint, this time in federal court, to add a
fourth count for willful and wanton misconduct.

The case proceeded through discovery and the marshal-
ing of experts until, nearly four years after the appellants
filed their original complaint, Textron filed a motion in
limine to exclude the appellants' three expert witnesses. As
we noted above, that motion was successful; the district
court granted it in its entirety. The district court then found
that, without the experts, the appellants could not prove
general or specific causation. It granted summary judgment
in favor of Textron on all of the appellants' claims.

Before we turn our attention to the experts, we note that
there are a number of contested facts that are not at issue in
this appeal. For example, this appeal is not about whether, or
with what frequency, Jason and Adele used bottled instead
of tap water to make formula for their infant children. Nor is

---

[3] In their Second Amended Complaint, the appellants added a fourth
count for willful and wanton misconduct.

this appeal about whether Jason and Adele's reverse-osmosis-water-filtration system sufficiently guarded the children against unacceptable levels of vinyl chloride.

Instead, this appeal is about whether the district court abused its discretion in excluding the appellants' experts based on *the reliability* of their methodology, and if it did not abuse its discretion, whether we should affirm its grant of summary judgment in favor of Textron. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.").

*B. The Experts*

Because our jurisdiction is based on diversity of citizenship, we apply federal procedural law and state substantive law. *Allen v. Cedar Real Estate Grp., LLP*, 236 F.3d 374, 380 (7th Cir. 2001) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). The parties do not dispute that Indiana substantive law applies here. To prove their toxic-tort claims under Indiana law, the appellants needed to present evidence of general and specific causation. *7-Eleven, Inc. v. Bowens*, 857 N.E.2d 382, 389 (Ind. Ct. App. 2006). General causation examines whether the substance—in this case, vinyl chloride—"had *the capacity* to cause the harm alleged[.]" *Id.* (emphasis added). Specific causation, by contrast, examines whether the substance did, *in fact*, cause the harm alleged. *Id.* (emphasis added). To satisfy this bifurcated burden, the plaintiffs offered the testimony of three experts: (1) Dr. James G. Dahlgren; (2) Dr. Vera S. Byers; and (3) Dr. Jill E. Ryer-Powder.

Both parties agree that these experts are well-qualified. So we can set that issue to the side. The dispute before us concerns the reliability of the methodology they employed in generating their expert opinions. The following section highlights their methodology as well as the district court's rationale in rejecting it. We begin with Dr. Dahlgren.

### 1. Dr. James G. Dahlgren

Dr. Dahlgren offered opinions on both general and specific causation, testifying that, in his judgment, vinyl chloride *can cause* and *did cause* the children's illnesses. He also opined that it is highly likely that both children will develop cancer at some point in the future. He based these opinions on a differential etiology[4] and the fact that levels of vinyl chloride detected in the appellants' water supply exceeded the regulatory levels set by the United States Environmental Protection Agency ("EPA") and the Indiana Department of Environmental Management, among other government agencies. Dr. Dahlgren also based his opinions on timing, or in his words, "temporality." In his view, the fact that the appellants' symptoms began after exposure to vinyl chloride

---

[4] "Etiology is the study of causation." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (citations omitted). A differential etiology is a process-of-elimination approach to determining a subject's cause of injury. Under this method, an expert "considers all relevant potential causes of the symptoms and then eliminates alternative causes." Federal Judicial Center, *Reference Manual on Scientific Evidence* 214 (1994). Although the parties and the district court below refer to this method as a "differential diagnosis," that term is really a misnomer. A "diagnosis" is concerned only about naming the condition or ailment, not establishing its cause. *Id.*; *see also Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825 n.7 (7th Cir. 2010).

and lessened after removal helps demonstrate that vinyl chloride is the cause.

As for Dr. Dahlgren's differential etiology, it is largely based on the findings (or lack thereof) of other doctors who have examined C.W. and E.W. To be sure, Dr. Dahlgren conducted physical examinations of both C.W. and E.W. He also reviewed their medical records. But his differential etiology is silent on these matters. According to Dr. Dahlgren, "[t]he scientific studies … demonstrate that damage to the immune system and the nervous system are known to be caused by [vinyl chloride] exposure. *The thorough evaluations by the childrens' [sic] doctors have not found an alternative explanation … ."* (emphasis added).

Thus, to accept Dr. Dahlgren's approach to differential etiology, one must accept both the scientific studies upon which Dr. Dahlgren relied and the care taken by the doctors who examined C.W. and E.W. One must also accept that vinyl chloride should be ruled in as a possible cause at all—a point we address below.

The district court found Dr. Dahlgren's methodology to be unreliable. Citing *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 674–75 (7th Cir. 2009), it first found that Dr. Dahlgren could not rely on regulatory exceedances to demonstrate causation. Second, the district court found that Dr. Dahlgren failed to connect the dots between the scientific studies that he analyzed and the opinions that he offered. This is a *Joiner* problem. In *Gen. Elec. v. Joiner*, 522 U.S. 136, 138 (1997), the Supreme Court decided to apply the abuse of discretion standard in reviewing the admission or exclusion of expert testimony. Affirming the district court's exclusion of the experts there, the Court held that "nothing in either

*Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 146 (citations omitted).

In the case before us, the district judge found fault in the studies that Dr. Dahlgren relied upon. "These articles … fail to establish that [vinyl chloride] at the dose and duration present in this case could cause the problems that the [p]laintiffs have experienced or claim that they are likely to experience." *C.W. v. Textron*, 2014 U.S. Dist. LEXIS 34938, at *53 (N.D. Ind. Mar. 17, 2014) ("*Textron I*"). The district judge then rejected Dr. Dahlgren's efforts to apply those studies to this case. *Id.* at *45 ("The problem again, however, is that … Dahlgren fails to bridge [the] gap by explaining how he is able to extrapolate" from those studies).

### 2. Dr. Vera S. Byers

Like Dr. Dahlgren, Dr. Byers also offered opinions on both general and specific causation. In her view, exposure to vinyl chloride *can cause* and *did cause* the children's illnesses. She traced the children's exposure to vinyl chloride to their ingestion of contaminated drinking water, inhalation of vapors from bathing, and dermal contact. She then linked that exposure to their gastrointestinal and immune-system problems. "The GI problems suffered by both children," Dr. Byers wrote, "are consistent with the adverse events associated with vinyl chloride exposure." As for the appellants' immune-system issues, she noted that C.W. and E.W. have a "very similar pattern of elevated … immune complexes … . Given that these two children are genetically unrelated, the

most probable cause of this acquired immune complex complement activation is the Vinyl Chloride exposure." Dr. Byers admitted that she knew little about C.W.'s and E.W.'s family medical histories. She further opined that both children are now at a heightened risk level for developing cancer.

Like Dr. Dahlgren, Dr. Byers based her opinion, in part, on a differential etiology. For E.W., Dr. Byers ruled in:

- Congenital structural abnormalities

- Infectious agents including viral

- Degenerative

- Neoplastic

- Toxicity including allergies or in this case exposure to vinyl chloride

- Metabolic disorders

- Psycho-social issues

She then ruled out each alternative explanation until siding with vinyl chloride as the specific cause.[5] To buttress her conclusion, Dr. Byers also relied on timing. "Vinyl Chloride exposure is the most probable cause of [E.W.'s] acute symptoms[,]" she opined. "Both children suffered these symptoms, most seriously by [E.W.], and both childrens' [*sic*] symptoms subsided when the exposure ceased."

Once again, to accept Dr. Byers's approach, one must accept as relevant the scientific studies upon which Dr. Byers relied. One must also accept that vinyl chloride should be

---

[5] Dr. Byers's report does not discuss a differential etiology for C.W.

ruled in as a possible cause in the first place. The district court accepted neither. It excluded Dr. Byers based on her attenuated studies and on her failure to adequately extrapolate from them.

### 3. Dr. Jill E. Ryer-Powder

That brings us to Dr. Ryer-Powder. In her initial report of August 17, 2011, she addressed the issue of general causation. Dr. Ryer-Powder claimed that the children's exposure to vinyl chloride was "at levels sufficient to cause harm" during the applicable time period. She further claimed that this same level of exposure was "sufficient to present an unacceptable risk of cancer in the future." Like Dr. Byers, she tied the appellants' exposure to ingestion, inhalation, and dermal contact with vinyl chloride.

For largely the same reasons the district court excluded the testimony of Doctors Dahlgren and Byers, the district court also excluded the testimony of Dr. Ryer-Powder. For example, Dr. Ryer-Powder relied on regulatory exceedances to formulate her opinion as to causation: "One means by which the health risks from exposures to chemicals can be assessed is by comparison to government standards and regulations." She found that in this case, the Woods' drinking water exceeded the standards set by relevant government agencies. So in her view, that meant vinyl chloride was within the realm of possible causes for the appellants' injuries.

Dr. Ryer-Powder also relied on attenuated studies concerning much higher exposure levels of vinyl chloride than the ones experienced here. As with Doctors Dahlgren and Byers, the district court found that she did not do the neces-

sary work of extrapolating from those studies to C.W. and E.W. In sum, the district court found that Dr. Ryer-Powder did not offer a reliable basis to support her proffered opinion.

With this overview in mind, we turn to the merits.

## II. ANALYSIS

*A. Principles of Law*

*1. Admissibility of Expert Testimony*

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), govern the admission of expert testimony in federal courts, even when our jurisdiction rests on diversity. *See Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010) (holding "standards for admitting expert evidence" are "matters that fall on the procedural side of the *Erie* divide," and are thus governed by federal law) (citations omitted). *Daubert* itself commenced as a state court action before it was removed to the Southern District of California on diversity grounds. 509 U.S. at 582.

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under this rule, expert testimony must not only assist the trier of fact. It must also demonstrate sufficient reliability—a key concern of the district court below. *Id.*

The district court is the gatekeeper of expert testimony.[6] We stress that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]" *Schultz v. Akzo Nobel Paints, LLC,* 721 F.3d 426, 431 (7th Cir. 2013) (citations omitted).

*Daubert* provides several guideposts for determining reliability. These guideposts examine (1) whether the scientific theory has been or can be tested; (2) whether the theory has been subjected to peer-review and/or academic publication; (3) whether the theory has a known rate of error; and (4) whether the theory is generally accepted in the relevant scientific community. *Schultz v. Akzo Nobel Paints, LLC,* 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert,* 509 U.S. at 593–94).

Importantly, this list is neither exhaustive nor mandatory. *Chapman v. Maytag Corp. (In re Chapman),* 297 F.3d 682, 687 (7th Cir. 2002). In some cases it may also be appropriate to examine, as the district court did here, whether there is "too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 146. Ultimately, reliability is determined on a case-by-case basis. *Ervin v. Johnson & Johnson,* 492 F.3d 901, 904 (7th Cir. 2007).

---

[6] We stress that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]" *Schultz v. Akzo Nobel Paints, LLC,* 721 F.3d 426, 431 (7th Cir. 2013) (citations omitted).

*2. Standard of Review*

We employ a two-step standard of review in cases challenging a district court's admission or exclusion of the testimony of an expert. First, we review *de novo* a district court's application of the *Daubert* framework. *United States v. Brumley*, 217 F.3d 905, 911 (7th Cir. 2000). If the district court properly adhered to the *Daubert* framework, then we review its decision to exclude (or not to exclude) expert testimony for abuse of discretion. *Id.* (citing *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 590 (7th Cir. 2000)).

*B. The District Court's Adherence to Daubert*

The district court properly adhered to the *Daubert* framework. The court began its exhaustive review of the appellants' three proposed experts by accurately outlining the *Daubert* framework. *Textron I*, 2014 U.S. Dist. LEXIS 34938, at *6–10. During that outline, the court aptly noted the need for flexibility in applying *Daubert*, particularly given "the various types of potentially appropriate expert testimony." *Id.* at *9 (citing *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003)) (additional citations omitted).

The court then conducted an in-depth review of the relevant studies that the experts relied upon to generate their differential etiology. *Textron*, *supra*, at *11–53. This careful approach stands in stark contrast to other cases where we concluded that courts did not adhere to the *Daubert* framework. *See, e.g.*, *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010) (declining to apply abuse of discretion standard where the district court's one-sentence expert determination did not satisfy *Daubert*); *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (same). And on a

much larger scale, the district court's approach follows the same path blazed by the Supreme Court in *Joiner*. 522 U.S. at 145 (reviewing four epidemiological studies advanced by the respondent in support of the experts' conclusions).

According to the appellants, however, the district court imposed an unachievable requirement that "published literature exist on the topic of vinyl chloride poisoning in small children." It did so, allegedly, despite the Supreme Court's admonition that "[p]ublication (which is but one element of peer review) is not a *sine qua non* of admissibility." *Daubert*, 509 U.S. at 593. The argument that the district court erroneously inflated the importance of publications is unavailing.

The appellants misread the district court's decision. The district court imposed no such requirement. Instead, it faulted the appellants' experts for failing to adequately extrapolate from the studies they had. To be sure, the district court also rejected some of the studies as too attenuated from the appellants' case. But its rejection of these studies is not tantamount to a requirement of absolute precision. Instead, its rejection is a recognition of an analytical gap too wide to be bridged.

Take, for example, the rejected study that analyzed the carcinogenic effect of vinyl chloride on lab rats.[7] Cesare Maltoni, *et al.*, *Carcinogenity Bioassays of Vinyl Chloride Monomer: A Model of Risk Assessment on an Experimental Basis*, 41 Envtl. Health Persp. 3 (1981). This study found no statistically sig-

---

[7] For the sake of economy, we pull two studies as a representative sample of the whole—one that deals with animals and one that deals with humans.

nificant increase in the number of tumors developed by rats that were fed 0.03 milligrams of vinyl chloride per kilogram of bodyweight, (0.03 mg/kg), of vinyl chloride per day (4 to 5 days per week, for 59 weeks), over the control group of rats that were fed only olive oil. *Id.* at 16, 21. Remarkably, 0.03 mg/kg is ten times higher than the amount the appellants allegedly ingested—Dr. Ryer-Powder estimates they ingested 0.003 mg/kg. And the rats ingested it over a period of time much longer, at least in rat years, than the children's exposure here. Given these facts, Dr. Ryer-Powder's conclusion that this study shows that C.W. and E.W. are now at an increased risk of developing cancer was an inferential leap that the district court was rightly unwilling to make.

This second rejected study, which analyzed the effect of vinyl chloride on French workers, fares no better. *See* Steven J. Smith, *et al.*, *Molecular Epidemiology of p53 Protein Mutations in Workers Exposed to Vinyl Chloride*, 147 Am. J. Epidemiology 302 (1998). It drew from a group of adults over the course of five years. *Id.* at 302. Yet C.W. and E.W. were exposed to vinyl chloride for less than seventeen and seven months, respectively. As for the levels of exposure, the workers were divided into exposure groups with the average level set at 3,735 parts per million. *Id.* at 304. That amount is over 1,000 times greater than the 3 parts per billion to which the children were exposed. Nevertheless, Dr. Byers offered it in support of her opinion that the children are at an increased risk of developing cancer.

In rejecting these studies and others like it, the district court properly exercised its role as gatekeeper under *Daubert*. And the district court acknowledged that studies need not be precisely analogous to meet the *Daubert* reliability

standard. *Textron I*, *supra*, at \*53 ("I am mindful that an expert's opinion does not have to be unequivocally supported by epidemiological studies in order to be admissible under *Daubert*.") (internal quotations and citations omitted). Accordingly, it is entitled to deferential review in the second stage of our analysis.

*C. The District Court's Exclusion of the Experts' Testimony*

Under the second step in our analysis, we apply the abuse of discretion standard of review. *Brumley*, 217 F.3d at 911. This standard demands that we "not disturb the district court's findings unless they are manifestly erroneous." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012) (citations omitted). A deferential standard, it flows from the "wide latitude and discretion" that district courts enjoy when deciding whether to admit or exclude expert testimony. *Ervin*, 492 F.3d at 904 (quoting *Wintz by & Through Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997)).

Here, the district court did not abuse its discretion in excluding the appellants' experts. The district court's primary concern, and ours on appeal, is the failure of the experts to connect the dots from the studies to the illnesses endured by the children. This is the *Joiner* problem to which we referred earlier. When a district court "conclude[s] that there is simply too great an analytical gap between the data and opinion proffered" such that the opinion amounts to nothing more than the *ipse dixit* of the expert, it is not an abuse of discretion under *Daubert* to exclude that testimony. *Joiner*, 522 U.S. at 146. That is what happened here.

The appellants counter with a reasonable argument. They note that there are no studies available on the impact of vi-

nyl chloride on children. These studies are unavailable because of the ethical and moral concerns of introducing toxins to children. This point is well taken and, we note, the district court recognized as much. *Textron I*, *supra*, at *44 ("[I]t's wholly unsurprising that Dahlgren was unable to cite a study at the precise dose and duration that the … children were subject to, and nothing in the case law says that he must do so.").

But there is a scientific end-around to make up for this dearth in literature. Scientists have developed computer-based models to extrapolate from animal data to human subjects, and from high doses to lower doses. Bernard D. Goldtsein & Mary Sue Henifin, *Reference Guide on Toxicology* in *Federal Manual on Scientific Evidence* 646 (3d ed. 2011) ("The mathematical depiction of the process by which an external dose moves through various compartments in the body until it reaches the target organ is often called physiologically based pharmokinetics or toxicokinetics."). Goldstein and Henifin recognize that "[a]dvances in computational toxicology" have facilitated this approach. *Id.* at 646–47. The EPA recognizes this and other methods of extrapolation as valid approaches to bridging the gap between the studies and the general public. U.S. Envtl. Prot. Agency, *Toxicological Review of Vinyl Chloride* 37–63 (2000) (discussing methods to extrapolate to low doses and to humans, generally). The appellants' experts do not mention or refer to this model of extrapolation.

As for the district court's rejection of the attenuated studies themselves, that too falls within the ambit of *Joiner*. *See* 522 U.S. at 144–45 ("The studies were so dissimilar to the facts presented in this litigation that it was not an abuse of

discretion for the District Court to have rejected the experts' reliance on them."). The district court's decision fell within its wide scope of discretion, and we will not upset it here.

The district court also found fault in the experts' differential etiology because, in its view, the etiology was not reliable. We agree. Dr. Dahlgren's differential etiology does not present the reliability that *Daubert* demands. An example is helpful here. After ruling in the alternative causes of "inheritance, allergy, infection or another poison," Dr. Dahlgren then ruled them out because, in his view, these causes "would have been detected by [the appellants'] doctors and treated accordingly."

This approach is not the stuff of science. It is based on faith in his fellow physicians—nothing more. The district court did not abuse its discretion in rejecting it. As for Dr. Byers's differential etiology, it showcases a rigor missing in Dr. Dahlgren's. But it nevertheless contains a fatal flaw: ruling in vinyl chloride as a cause in the first place. Without the benefit of analogous studies and an acceptable method of extrapolation, Dr. Byers, like the other experts, is forced to take a leap of faith in pointing to vinyl chloride as having the *capacity* to cause the injuries (and risk of injury) to C.W. and E.W. The district court ably performed its gatekeeper role in shielding a jury from this leap.

Dr. Ryer-Powder seeks a boost from government regulation. Recall her report: "One means by which the health risks from exposure to chemicals can be assessed is by comparison to government standards and regulation." But exceedance of government regulation, as we've held before, does not by itself prove causation. *See Cunningham*, 569 F.3d at 675 (rejecting this approach because the expert would have to

know "the specific dangers" that caused the regulatory agency "to pick the safe level it did"). The district court did not abuse its discretion in rejecting this methodology. To the extent the experts also based their opinions on the timing of C.W.'s and E.W.'s injuries, the district court properly rejected this methodology as well. *Ervin*, 492 F.3d at 904–05 (7th Cir. 2007) ("The mere existence of a temporal relationship between taking a medication and the onset of symptoms does not show a sufficient causal relationship.").

In sum, the district court did not abuse its discretion in excluding the appellants' experts. We now turn to the final question on appeal: whether that exclusion was fatal to the appellants' toxic-tort case.

*D. Summary Judgment*

We review a district court's grant of summary judgment *de novo*. *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014). Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact. Fed. R. Civ. P. 56(c).

Given the complex nature of this case, and considering the appellants make no argument that their case can survive without the excluded experts,[8] this final issue can be resolved more simply. With no experts to prove causation—be it general or specific, *see Bowens*, 857 N.E.2d at 389—the ap-

---

[8] Before the district court, the appellants' argued that the opinions of their treating physicians, Doctors Claude Ruffalo and Jerrod Feldman, along with Textron's expert, Dr. Thomas McHugh, were sufficient to establish causation to survive summary judgment. *Textron II, supra*, at *5–6. These arguments are not advanced here.

pellants cannot prove their toxic-tort case under Indiana law. Accordingly, we hold that summary judgment in this case was proper.

Before concluding, however, we must part ways with the district court's rationale in granting summary judgment. For we think the court unnecessarily foreclosed an issue better left open for future litigants in other cases. The district court held that differential etiology "cannot be used to support general causation." *C.W. v. Textron*, 2014 U.S. Dist. LEXIS 141593, at *11 (N.D. Ind. Oct. 3, 2014) ("*Textron II*"). It reiterated this holding in a footnote: "Differential [etiology] is admissible only insofar as it supports specific causation, which is secondary to general causation … ." *Id.* at *12 n.3.

We disagree with the district court's categorical exclusion of differential etiology as a method to establish general causation. Indiana recognizes the important role that differential etiology plays in toxic-tort cases. *Hannan v. Pest Control Servs.*, 734 N.E.2d 674, 682 (Ind. Ct. App. 2000). And there may be a case where a rigorous differential etiology is sufficient to help prove, if not prove altogether, *both* general *and* specific causation.[9] The Second Circuit already takes this ap-

---

[9] The Federal Rules of Evidence contemplate using one piece of evidence to help prove multiple facts in issue. That is why, in appropriate circumstances, Rule 105 allows a district court to restrict the scope of evidence and instruct a jury accordingly. Fed. R. Evid. 105. For this reason, among others, at least one scholar believes differential etiology "should be admissible on general causation." Edward J. Imwinkelreid, *The Admissibility and Legal Sufficiency of Testimony About Differential Diagnosis (Etiology): Of Under–and Over–Estimations*, 56 Baylor L. Rev. 391, 406 (2004) ("[A]n etiological opinion expressly addressing specific causation is also relevant to general causation; a plausible finding that a factor was the cause in a

(continued…)

proach. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005) ("There may be instances where, because of the rigor of differential diagnosis performed, the expert's training and experience, the type of illness or injury at issue, or some other … circumstance, a differential diagnosis is sufficient to support an expert's opinion in support of both general and specific causation."). And we adopt it today.

### III. CONCLUSION

For the foregoing reasons, the district court properly applied the *Daubert* framework to the appellants' experts. It did not abuse its discretion in excluding their testimony. Without expert testimony to prove general and specific causation, the appellants could not prove their case. Although we disagree with the district court that differential etiology can never be used to establish general causation, we nevertheless AFFIRM its final judgment.

---

(…continued)

specific case slightly strengthens the inference that the factor in question is capable of causing illness which the plaintiff developed.").