In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 16-1799, 16-2376, 16-2377, 16-2378, 16-2379 & 16-2380

JANET PECHER, Individually and as
Special Administrator for the Estate
of Urban Pecher, Deceased, et al.,

*Plaintiffs-Appellants,*

*v.*

OWENS-ILLINOIS, INC., et al.,

*Defendants-Appellees.*

———————————

Appeals from the United States District Court for the
Western District of Wisconsin.
Nos. 3:14-cv-00147, 3:12-cv-00899, 3:14-cv-00186, 3:14-cv-00219,
3:14-cv-00286 & 3:14-cv-00161 — **William M. Conley**, *Chief Judge.*

———————————

FEBRUARY 16, 2017 — DECIDED JUNE 6, 2017

———————————

Before FLAUM, MANION, and KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* The six cases consolidated on appeal all involve claims related to asbestos exposure over

thirty years ago at a single Marshfield, Wisconsin plant which produced fire doors.[1] While complex on the surface, and involving bulky appendices and appeals of separate orders, the thrust of the appeal is quite simple: the claims at issue are covered by the exclusive remedy provisions of Wisconsin's Worker's Compensation Act, Wis. Stat. § 102.03(2). Plaintiffs attempt to get around this bar by recharacterizing their injuries as occurring off the job. These arguments are unavailing. In addition, the claims against Owen-Illinois claims are frivolous. As a result, we affirm the multiple rulings of the district court dismissing the claims against both defendants on appeal and denying reconsideration.

## I.    Background

In April 1952, the United States Patent and Trademark Office issued Patent No. 2,593,050 for a "Composite Fire Door," assigned to defendant Owens-Illinois. The useful innovation was a fire door that was up-to-code and easy to produce. The patent claims themselves never specifically mention the use of asbestos, but instead describe a fire door with a "core of inorganic, rigid, fire-proof, light weight material of a substantially uniform apparent density and consistency throughout." Later versions of the patent contemplate this core material being "conventional solid, foam, or honey-combed construction and the like, comprising magnesium oxychloride foam cement, expanded polyurethane, mineral wool mats or gypsum or hardboard honeycomb or egg-crate construction *or boards of asbestos*

---

[1] All references will be to this "Marshfield plant." Until 1960 it was owned and operated by Roddis Plywood. After 1960 it was owned and operated by Weyerhaeuser.

*bound with cement*." While included as examples, these are not elements of the patented subject matter.

In 1956, Owens-Illinois entered into a licensing agreement with Roddis Plywood, set to expire on termination of the patent in 1969. In 1960, Weyerhaeuser Company purchased Roddis Plywood. From some time in the 1950s all the way until 1978, the Marshfield, Wisconsin plant at issue produced at least some fire doors that used asbestos as its thermal insulator. By June 1978, however, the Marshfield plant had ceased using asbestos.

The six plaintiffs on appeal were all employees of that Marshfield plant. All six plaintiffs (or the decedents they represent) developed mesothelioma as a result of asbestos exposure, and on appeal all six raise claims against Owens-Illinois under a theory of negligence arising out of patent design. Three of the six plaintiffs (the "Weyerhaeuser plaintiffs")—Diane Jacobs, Katrina Masephol, and Janice Seehafer—raise claims against Weyerhaeuser Company related to household or community exposure to asbestos.

The initial case involved numerous defendants, and one by one they have dropped out as the case has developed. The two remaining defendants are Weyerhaeuser Company and Owens-Illinois. Claims against Weyerhaeuser by Jacobs, Masephol, and Seehafer were dismissed in an order of February 19, 2016, and a motion for reconsideration was denied on May 5, 2016. These three, represented by the same lawyers, filed a notice of appeal on Monday, June 6, 2016, regarding numerous dismissal orders or orders denying the reconsideration of the dismissal orders. These cases were consolidated with the claims against Owens-Illinois on appeal.

Claims against Owens-Illinois, based upon the licensing of a patent, by plaintiffs Masephol, Boyer, and Seehafer were dismissed in an August 22, 2014, order. Perhaps in light of that order, the remaining three plaintiffs agreed to dismiss similar claims against Owens-Illinois in a stipulation accepted by the court on June 16, 2015, styling the dismissal as "involuntary." Five of the six plaintiffs filed their notice of appeal with respect to claims against Owens-Illinois on June 6, 2016 (three of them appealing claims against Weyerhaeuser in the same order). One plaintiff, Janet Pecher, filed her notice of appeal on April 11, 2016, apparently relating back to a standard order of dismissal accepting a settlement from Weyerhaeuser on March 11, 2016.

Needless to say, the posture of this kitchen-sink consolidated appeal is irregular. Nevertheless, the gravamen of the case can be split into two parts: the claims against Weyerhaeuser Company, and the claims against Owens-Illinois. Upon full review, it is clear that all of the orders dismissing the claims against both defendants were proper, and the various appealed orders of the district court are affirmed.

## II.     Analysis

### A.  Claims Against Weyerhaeuser Company

Three plaintiffs appeal the dismissal of their claims against Weyerhaeuser Company related to their claims for community and household exposure to asbestos. Each of the Weyerhaeuser plaintiffs worked at Weyerhaeuser for years in close contact with asbestos. Therefore, on the surface at least, it appears their claims should be limited to the procedures set out in Wisconsin's Worker's Compensation Act, which

provides the "exclusive remedy against the employer" for work-related injuries. Yet plaintiffs contend that their asbestos-related injuries were not caused on the job, but at home and in the community, and style these as public and private nuisance claims. For example, one plaintiff, Roger Seehafer, worked for 44 years at the plant cutting and drilling asbestos mineral cores. When he developed mesothelioma years later, plaintiffs' counsel attributes this not to his work in the plant, but to the ambient asbestos in the surrounding community, a public nuisance that significantly contributed to his mesothelioma as he went about his side job hauling milk to and from a dairy a few blocks away. He also relies on ambient exposure related to his one month living in the same city as the plant.

Plaintiffs presented expert witnesses in support of this theory. With respect to the three of the plaintiffs on appeal adverse only to Owens-Illinois (Kathy Boyer, Janet Pecher, and Robert Sydow), the district judge admitted the expert testimony under Fed. R. Evid. 702. But the district judge *rejected* that expert testimony in the cases of the three Weyerhaeuser plaintiffs who appeal this ruling—Masephol, Seehafer, and Jacobs. The district court reasoned that these plaintiffs failed to demonstrate that the expert testimony would be reliable in their cases. This was because none of the three plaintiffs demonstrated that they lived close enough to the Marshfield plant long enough for the experts to opine that non-occupational exposure contributed significantly to their injuries. The district court, reasonably, noted that a small exposure might "contribute" to contracting mesothelioma. But the testimony of the experts themselves could not support the legal finding of proximate causation for such non-occupational exposure in the cases of Masephol, Seehafer, and

Jacobs. However, the court noted that the testimony of the experts might support a finding of proximate causation in the cases of Boyer, Pecher, and Sydow. The court specified it could not "ignore the real possibility that any trier of fact might be unable to balance defendant's right to exclude liability or damages for *occupational* exposures under compensation laws against the understandable, if unduly prejudicial, sympathy that would be engendered at trial in light of the inexorable pain and death that results from this disease."

One need not read between the lines to note that the district court was concerned that the expert testimony proffered by plaintiffs' counsel was an attempt to avoid the exclusive remedy provisions of Wisconsin law, offering jurors a way to award damages under a cause of action that should otherwise be foreclosed. Indeed, the court noted that "it may well be the outcome of any trial" that the jury finds that all of the plaintiffs' injuries were solely caused by occupational exposure. Even with this in mind, the district court still managed to allow the expert testimony into the Boyer, Pecher, and Sydow cases, because each of these plaintiffs lived closer to the factory. This admission under Rule 702 seems overly deferential to a highly dubious theory of harm, but neither this nor the exclusion of the same testimony with respect to the three plaintiffs on appeal could be considered an abuse of discretion. *C.W. v. Textron, Inc.*, 807 F.3d 827 (7th Cir. 2015). the district court noted in the same order, absent this novel claim of non-occupational exposure, the three Weyerhaeuser plaintiffs (Jacobs, Masephol, and Seehafer) had "failed to put forth sufficient evidence for a reasonable jury to conclude that non-occupational asbestos exposure was a substantial contributor to their respective injuries." Accordingly, the

district court properly dismissed the public and private nuisance claims.

Quite apart from the problems of causality, however, the private nuisance claims fail for a second reason noted by the district court: the plaintiffs failed to provide any individual proof of a current possessory interest in land tainted by asbestos. Plaintiffs do not even attempt to remedy this waiver on appeal, instead claiming that their "use and enjoyment" of the property they owned decades ago was limited by mesothelioma they developed recently. Under Wisconsin law, however, a private nuisance is an interference with a real property interest. Wisc. Stat. § 844.01. There is no contention that the plaintiffs were limited in their use or enjoyment of the property they owned at the time; rather, the argument is that they were harmed by ambient asbestos during their ordinary, unimpeded use and enjoyment of their property, and that they had no idea until they developed mesothelioma years later. Also for that reason, as noted by the district court, these claims would fall outside the six-year Wisconsin statute of limitations for such claims. Wis. Stat. § 893.52.

## B.  Claims Against Owens-Illinois, Inc.

The claims against Owens-Illinois all relate to the company having licensed its Patent No. 2,593,050 to Weyerhaeuser Company during the operative time period. Specifically, all six plaintiffs on appeal alleged that because the fire doors produced at the Marshfield plant were designed by Owens-Illinois, and because Weyerhaeuser happened to use asbestos in producing the fire doors, Owens-Illinois should be on the hook for asbestos-related injuries to Weyerhaeuser employees. Throughout the amended pleadings, the specific form of this argument shifted from a

failure-to-warn claim related to the design, to a negligence claim related to the design, to a strict liability claim that Owens-Illinois actually produced some of the asbestos cores contained in the fire doors (there is no evidence for this). In short, the plaintiffs did everything in their power to keep Owens-Illinois a party to this litigation.

However, the claims against Owens-Illinois are frivolous. As noted by the district court in its order of August 22, 2014, dismissing the claims for the first time, there is unanimity among courts that product liability cannot attach to the mere licensing of a patent. In those cases where tort liability can attach to a non-manufacturing licensor of intellectual property, there is always some additional factor for attributing liability.

In arguing for liability for patent holders for products produced by others, plaintiffs cite to the complex statutory scheme envisaged by the Hatch-Waxman Act, 98 Stat. 1585. That Act allows for manufacturers of branded drugs to be on the hook for mislabeling on their generic counterparts, precisely because the generic drug manufacturers are prohibited by law from altering the label in any way.[2] In such

---

[2] *Dolin v. SmithKline Beecham Corp.*, 62 F. Supp. 3d 705, 711 (N.D. Ill. 2014). As the court noted in that case: "The Act provides for an expedited, less costly approval process for generic versions of drugs whose name-brand predecessors have already obtained FDA approval. Once the name-brand manufacturer's patent expires, generic manufacturers are able to enter the market with the benefit of a far more streamlined approval process. This generic drug application process is referred to as the Abbreviated New Drug Application … One caveat of this approach, however, is that the generic drug's design and warning label must identically match that of the name-brand version of the drug in all material respects." *Id.* In exchange

a case the branded manufacturer can be said to have "caused" any mislabeling by a generic drug manufacturer, even if the branded drug manufacturer had no hand in the manufacture or distribution of the drug or the labels.

However attenuated the causal chain in that context, it pales in comparison to the theory of liability advanced by a plaintiff. This theory would hold a patent licensor liable for the injuries caused not merely by the licensees practicing the patented subject matter, but for injuries caused by other, non-essential features of the final product produced by the licensee. Holding a patent licensor liable for injuries they in no sense could be considered to have "caused" raises serious due process concerns. Furthermore, there is no reason to believe such a theory of liability could be limited to situations in which the patentee and the licensee at issue have a face-to-face relationship. Many research entities, such as universities, do not directly practice their patents or directly license them. Rather, they license their patents to a third party who then turns around and re-licenses again. And ultimately, why not hold the lab researcher himself personally liable if somewhere, down the line, some licensee produces his invention and chooses to build it using a toxic substance?

To the extent the plaintiffs' theory sounds in negligence, and that by designing a door Owens-Illinois opened itself up to liability when workers produced the door, the theory fares no better. The production of ball bearings involves working with molten metal: this is a physical necessity, and readily foreseeable. Yet we do not hold the patentee for "a process to

---

for this subsidy to their competitors, branded manufacturers were granted extended patent terms.

create ball bearings" accountable for safety slips simply because he or she patented or licensed a process that could involve injury. The patent system is designed to facilitate innovation, to disseminate useful technology far and wide. It is not a substitute for a worker's compensation system.

However described, the plaintiff's theory of liability is, as Owens-Illinois notes, not supported by "any decision anywhere." In spite of this, plaintiffs have sought to keep Owens-Illinois a party to this litigation, even going so far as to suggest, without evidence, that Owens-Illinois itself manufactured some of the asbestos cores contained in the fire doors at issue. It gets worse. The record indicates that all relevant claims against Owens-Illinois were dismissed with prejudice on a joint stipulation of the parties on June 16, 2015, on the condition that Owens-Illinois bear its own costs. And yet, plaintiffs reraise these same claims on appeal, in clear contravention of Fed. R. Civ. P. 41(a)(2) and the joint stipulation. *Chavez v. Ill. State Police*, 251 F.3d 612, 654-55 (7th Cir. 2001) ("The case law is clear … that when a district court grants voluntary dismissal[, under Rule 41] a plaintiff has neither the reason nor the right to appeal the dismissal because the plaintiff has received the relief it requested."). [3]

Counsel for Owens-Illinois responds on the merits to these arguments regarding liability, and offers only the most gentle rebuke in their briefing on appeal. But after being haled into

---

[3] We might speculate that this stipulation was an attempt to bring four similarly situated plaintiffs (Pecher, Jacobs, Sydow, and Seehafer) within the ambit of the August 22, 2014 district court order dismissing identical claims. But when presented with a voluntary dismissal by the parties the district court is in a very different situation than when presented with a motion to dismiss for failure to state a claim.

court yet again on what appear to be claims both frivolous and dismissed on a stipulation of the parties, one wonders if counsel for Owens-Illinois has resigned itself to endless litigation. It should not. The district court orders dismissing the claims against Owens-Illinois are affirmed, and plaintiffs' counsel must show cause why this portion of the appeal was not frivolous under Rule 38.

### III.    Certificate of Compliance

At oral argument, we brought to the attention of plaintiff's counsel the non-compliance of its briefing with Fed. R. App. P. 32(a)(7) and our local rules. Specifically, we asked counsel why the briefing was so lengthy and why citations were made without spaces, in order to mask the true word count. Counsel indicated that he had requested and been granted leave to enlarge the type-volume limitation to 16,500 words, but had no explanation for the spacing. He had certified that the brief contained 16,453 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(f). Our review of the brief is that on an ordinary word processor it does appear to be just under the word limit. When the citations are cleaned up, however, the count is well over 17,000 words. As we advise in our circuit brief filing checklist, counsel "must assure that they count all words in the brief before certifying compliance with Rule 32." *See also DeSilva v. DiLeonardi*, 185 F.3d 815 (7th Cir. 1999).

The filing error before us is not, however, the sort of unintentional error made by differences in word processor counting functions. It was undoubtedly deliberate. As we noted at oral argument, one string citation without spaces counted as a single word; the same string citation, cleaned up, counted as sixty-eight. This strategy is repeated throughout

all seventy-seven pages of the primary brief. A practitioner before this circuit can take one look at the briefing in this case and observe that its bulk is out of the ordinary: no reasonable attorney could have, in good conscience, certified compliance with the type-volume requirements.[4]

## IV.    Conclusion

For the foregoing reasons, the decisions of the district court below are AFFIRMED. Furthermore, the plaintiffs have 14 days to show cause why sanctions should not be imposed for the failure to comply with the type-volume limitations of Rule 32, and to explain why the appeal of the claims involving Owens-Illinois was not frivolous under Rule 38.

---

[4] This is not even to mention the six additional CDs of sealed material that snuck into the record on appeal, apparently in violation of a June 3, 2015, order of the district court and a confidentiality agreement executed by the parties that same day.